*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0329P (6th Cir.)
File Name: 03a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CAROLYN T. RODGERS,
    *Plaintiff-Appellant,*

    *v.*

ELIZABETH BANKS,
    *Defendant-Appellee.*

No. 01-4034

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00780—Susan J. Dlott, District Judge.

Argued: March 12, 2003

Decided and Filed: September 17, 2003

Before: MOORE and CLAY, Circuit Judges; LAWSON,
District Judge.[*]

---

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**COUNSEL**

**ARGUED:** William B. Singer, Cincinnati, Ohio, for Appellant. Anne E. Thomson, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** William B. Singer, Cincinnati, Ohio, for Appellant. Anne E. Thomson, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge. Plaintiff Carolyn T. Rodgers brought this action pursuant to 42 U.S.C. § 1983, alleging, *inter alia,* that Defendant wrongfully terminated Plaintiff from her employment in violation of Plaintiff's First Amendment right to free speech. Plaintiff appeals from the district court's granting of Defendant Elizabeth Banks' motion for summary judgment and dismissal of Plaintiff's case. We hold that although the Eleventh Amendment bars Plaintiff from seeking money damages from Defendant, Plaintiff produced sufficient evidence of a First Amendment retaliation claim to survive summary judgment, and that the district court's dismissal of this claim was inappropriate. We therefore **REVERSE** the judgment of the district court.

**I.**

Plaintiff was employed by the Pauline Warfield Lewis Center ("Lewis Center"), an Ohio state mental hospital in Cincinnati. She began her employment at the Lewis Center as a social worker and was eventually promoted to Director of Quality Management, a position designated in the unclassified civil service of Ohio. According to Plaintiff, the "principal task" of this position was to "prepare the Center for surveys

by the Joint Commission on Accreditation of Hospitals [JCAH] and other surveying organizations." (J.A. at 7.) Defendant was the CEO of the Lewis Center. Plaintiff reported to Alice Gray, Director of Support Services, and Gray reported to Defendant.

On January 21, 1999, Defendant revoked Plaintiff's unclassified appointment. In a memo informing Plaintiff of the revocation, Defendant stated, "I no longer have confidence in your ability to function as the hospitals [sic] Quality Management Director, your verbal and written communication skills are not conducive to a cooperative work environment." (J.A. at 53.)

Specifically, the dispute concerns various statements Plaintiff made during her tenure at the Lewis Center. Defendant maintains that Plaintiff's manner and method of communication had offended and inflamed her coworkers and subordinates at the Lewis Center. In particular, Defendant highlighted an incident which began when one of the Lewis Center's psychiatrists requested that his office be moved to one of the patient units. Defendant granted the psychiatrist's request, ostensibly to encourage doctors to maintain closer physical proximity to their patients. Plaintiff, who apparently was concerned that the psychiatrist's move had compromised patient privacy in the unit, sent a memorandum to Defendant, dated August 7, 1998, in which she discussed the allocation of space in the Lewis Center's psychiatric units as it related to an upcoming JCAH survey. We reproduce the memorandum below in its entirety:

DATE:      August 7, 1998

TO:         L. Banks, CEO

FROM:    C. Rodgers, LISW
              Director, Quality Management

SUBJECT:   Survey Preparedness
                Patient Rights and Ethics

In the Supplemental Recommendations last survey, we had a recommendation regarding privacy for patients. This area will be scrutinized in the coming survey with a risk of a Type I.

Patient visiting in privacy is hindered by lack of space-- especially on Units 1 through 6. There are the dining room and two days [sic] rooms. The day rooms are also used for group process--we have worked very hard the last three years to have more groups on the units.

In doing a walk-around during the Mock Survey, I was amazed to see that a patient/program/visiting area had been turned into an MD's office on Unit 4.

- The forensic units need more space for patients who have low level privileges and cannot leave the unit.

- The nature of Forensic patients on a confined unit would indicate a need for as much "personal space" as possible.

- This sets a precedent for the other psychiatrists to have "special" needs that rationalize taking large patient and visiting areas for office space.

> Dr. Natarajan - Unit 1
> Dr. Mannava - Unit 2
> Dr. Holtman - Unit 5
> The 1199 psychiatrist on Unit 5
> Dr. Rodgers Wilson on Unit 6

In the new architectural plan there may be a space for the unit psychiatrist, and no one is denying that this would be optimal. However, the patient's needs, including space for visits with families and privacy for visiting should be the most important factor.

R/pp/daw

cc: Alice Gray
    Paul Blackwell
    M. Russ

(J.A. at 139.)

According to Defendant, other communications Defendant considered inappropriate included (1) arguing with the housekeeping director about the cleanliness of the restrooms in front of other Lewis Center employees, (2) arguing with another employee and then detailing the incident in an e-mail to the Lewis Center's director of operations, and (3) presenting a quality management report at an administrative meeting in a "very angry and hostile manner" and accusing management of not caring about quality standards. Plaintiff acknowledges that these various "instances of communication" occurred (J.A. at 10-11), but she contests the manner and disruptive nature of her statements as characterized by Defendant.

Following her termination, Plaintiff filed a complaint with the district court, alleging "reverse" racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). In this complaint she requested injunctive relief ordering reinstatement of Plaintiff to her job, as well as compensatory and punitive damages.[1] Plaintiff subsequently filed an amended complaint, alleging that Defendant wrongfully terminated her for exercising her First Amendment right to free speech, and requesting "damages and other relief" provided under 42 U.S.C. § 1983. (J.A. at 10-12.)

---

[1] Although both Plaintiff and Defendant are white females, Plaintiff alleged in her original complaint that most of the employees at the Lewis Center were black and that she, as a "minority" in this employment setting, experienced employment discrimination.

Discovery ensued, during which the depositions of Plaintiff and Defendant were taken. During Defendant's deposition, she was asked what factors contributed to Plaintiff's termination, Defendant pointed to, among other incidents, Plaintiff's August 7, 1998 memo regarding the upcoming JCAH survey and patient privacy. Defendant characterized the memo as offensive, overly critical, and inaccurate.

After discovery, Defendant filed a motion for summary judgment on both of Plaintiff's claims. Plaintiff filed a memorandum in opposition, at which time she withdrew the Title VII "reverse" racial discrimination claim but opposed summary judgment on her §1983 First Amendment claim. In support of her First Amendment claim, Plaintiff further asserted that her termination was motivated by the August 7, 1998 memorandum she sent to Defendant.

On August 23, 2001, the district court granted summary judgment to Defendant, reasoning that Plaintiff's August 7, 1998 memo to Defendant did not touch upon a matter of public concern and, therefore, Plaintiff's First Amendment claim necessarily failed. Plaintiff's timely appeal followed.

## II.

Defendant first argues that, pursuant to the Eleventh Amendment, she is immune from Plaintiff's § 1983 action to the extent that the lawsuit seeks money damages. This argument presents a legal question, which we review *de novo. Timmer v. Mich. Dep't of Commerce,* 104 F.3d 833, 836 (6th Cir. 1997) (citing *Williams v. Kentucky,* 24 F.3d 1526, 1543 (6th Cir. 1994)). We agree with Defendant that, on this record, the Eleventh Amendment precludes Plaintiff from seeking money damages from Defendant.

In general, "[s]tate governments and entities that can be considered arms of the state are immune from suits for money damages under the Eleventh Amendment." *Alkire v. Irving,* 330 F.3d 802, 814 (6th Cir. 2003) (citing *Brotherton v.*

*Cleveland,* 173 F.3d 552, 560 (6th Cir. 1999)). Specifically, the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66 (1989). Therefore, § 1983 plaintiffs should "set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply their capacity as state officials." *Shepherd v. Wellman,* 313 F.3d 963, 967 (6th Cir. 2002) (quoting *Wells v. Brown,* 891 F.2d 591, 593 (6th Cir. 1989) (internal quotation marks omitted)).

However, a plaintiff's failure to explicitly state "individual capacity" in the complaint is not necessarily fatal to the lawsuit. Rather, in this situation we employ a "course of proceedings" test to ascertain whether a § 1983 defendant was on notice that the plaintiff intended to hold him or her personally liable, notwithstanding the plaintiff's failure to provide explicit notice. *Id.* at 967-68 (citing *Moore v. City of Harriman,* 272 F.3d 769, 772 (6th Cir. 2001) (*en banc*)). Pursuant to this inquiry, "we consider the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims for qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 968 (citing *Moore,* 272 F.3d at 772 n.1). Additionally, we "consider whether subsequent pleadings put the defendant on notice of the capacity in which he or she is being sued." *Id.* (citing *Moore,* 272 F.3d at 772 n.1).

Like the plaintiff in *Moore,* Plaintiff did request compensatory and punitive damages in the original complaint, which we have held provides some notice of her intent to hold Defendant personally liable. *See Moore,* 272 F.3d at 772 n.1. However, unlike the plaintiff in *Moore,* the caption on Plaintiff's complaint listed Defendant's name and her official title, and specifically stated that Defendant was being sued in

her "official capacity as the representative of the State of Ohio department of Mental Health." (J.A. at 6 ¶ 2.)

We do note that the original complaint only alleged a Title VII violation, and the complaint was subsequently amended to add the § 1983 First Amendment claim. Although the amended complaint presented an opportunity for Plaintiff to clarify the issue, it failed to provide sufficient notice that Defendant was being sued in her individual capacity, as required by *Moore.* The amended complaint's caption still lists Defendant's name and official title, and the amended complaint incorporates by reference paragraphs 2-7 of the original complaint, including the statement that Defendant was being sued in her official capacity. The amended complaint is otherwise silent as to whether Defendant is being sued in her official or individual capacity. Moreover, Defendant has not moved for summary judgment on the issue of qualified immunity, yet another indication that Defendant was not adequately notified that she was being sued in her individual capacity. *See Moore,* 272 F.3d at 772 n.1.

Having applied the course of proceedings test, we hold that insufficient indicia exists in the original complaint and amended complaint suggesting that Defendant was on notice that she was being sued in her individual capacity. Therefore, the Eleventh Amendment bars Plaintiff's suit to the extent that she seeks money damages. Plaintiff's claim is hereafter limited to seeking other relief arising under 42 U.S.C. § 1983. We will now proceed to the merits of Plaintiff's First Amendment claim.

### III.

We review a district court's order granting summary judgment *de novo. Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir. 2002). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If the moving party satisfies this initial burden, the non-moving party must then "set forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

In evaluating the evidence, we "draw all reasonable inferences therefrom in a light most favorable to the non-moving party." *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.,* 305 F.3d 498, 505 (6th Cir. 2002) (citing *Williams v. Int'l Paper Co.,* 227 F.3d 706, 710 (6th Cir. 2000)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment; rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

Plaintiff argues on appeal that the district court erred in granting Defendant's motion for summary judgment because the evidence in the record, if believed, establishes that Defendant violated Plaintiff's First Amendment rights. We agree with Plaintiff and therefore reverse the district court's dismissal of this claim.

Section 1983 provides a federal cause of action for the violations of federal statutory or constitutional rights by state

officials acting under color of law. *Lomaz v. Hennosy,* 151 F.3d 493, 500 (6th Cir. 1998). To assert a valid § 1983 cause of action, a plaintiff must demonstrate that "1) [the plaintiff] was deprived of a right secured by the Constitution or laws of the United States and that 2) the deprivation was caused by someone acting under color of state law." *Perry v. McGinnis,* 209 F.3d 597, 603 (6th Cir. 2000) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)). The parties dispute only the first issue, i.e., whether Plaintiff suffered a deprivation of a right secured by the Constitution or federal law. Plaintiff bases her § 1983 claim on Defendant's decision to terminate Plaintiff, allegedly in retaliation for Plaintiff's exercise of her First Amendment right to speech.

While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, *Rankin v. McPherson,* 483 U.S. 378, 383 (1987) (citing *Perry v. Sindermann,* 408 U.S. 593, 597 (1972)), a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions. *See United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 475 n.21 (1995). Therefore, in determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry. First, a court must ascertain whether the relevant speech addressed a matter of public concern. *See Connick v. Myers,* 461 U.S. 138, 143 (1983). If the answer is yes, then the court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968). Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Perry,* 209 F.3d at 604.

## A.   Prong One:  A Matter of Public Concern

The threshold inquiry is whether Plaintiff's speech addressed a matter of public concern.  *Rankin,* 483 U.S. at 384; *Dambrot v. Cent. Mich. Univ.,* 55 F.3d 1177, 1186 (6th Cir. 1995).  We review the district court's determination on this issue *de novo.  Dambrot,* 55 F.3d at 1186 (citations omitted).  Our inquiry in this regard requires us to consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147-48.

Matters of public concern include speech that "relat[es] to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146.  In other words, we must determine whether the relevant speech "involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Brandenburg v. Hous. Auth. of Irvine,* 253 F.3d 891, 898 (6th Cir. 2001) (quoting *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir. 1983)).  Thus, speech falling into this category includes informing the public that a governmental entity failed to "discharg[e] its governmental responsibilities" or "bring[ing] to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein]." *Connick,* 461 U.S. at 148.

Along these lines, the Supreme Court has emphasized that the employee must be speaking as a citizen, not as an employee for personal interest purposes. *Connick,* 461 U.S. at 146-47.  Thus, "internal personnel disputes or complaints about an employer's performance" do not touch upon a matter of public concern and therefore fall outside the scope of First Amendment-protected speech. *Brandenburg,* 253 F.3d at 898; *see also Jackson v. Leighton,* 168 F.3d 903, 910-11 (6th Cir. 1999) (holding that the state hospital employee's statement advocating "that a letter be sent to the Board of Trustees declaring the lack of confidence with [the administrator] was nothing more than an example of the

'quintessential employee beef' of incompetent management") (quoting *Barnes v. McDowell,* 848 F.2d 725, 735 (6th Cir. 1988) (internal citation in *Barnes* omitted)).

Additionally, in distinguishing between matters of public and private concern, we focus not on "what might incidentally be conveyed by the fact that the employee spoke in a certain way, [but] the *point* of the speech in question." *Dambrot,* 55 F.3d at 1187 (quoting *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir. 1985)) (alteration in original and internal quotation marks omitted).  Thus, "[c]ontroversial parts of speech advancing only private interests do not necessarily invoke First Amendment protection." *Id.*  However, the employee's entire speech does not have to focus on  matters of public concern, as long as some portion of the speech does so. *Rahn v. Drake Ctr., Inc.,* 31 F.3d 407, 412 (6th Cir. 1994) (citing *Connick,* 461 U.S. at 146-49).

In granting summary judgment to Defendant on Plaintiff's First Amendment claim, the district court determined that Plaintiff's August 7, 1998 memo did not relate to an issue of public interest or concern.[2]  The district court's entire analysis of this inquiry was as follows:

The Court does not find this letter to be of public concern.  "First Amendment protection extends to a public employee's speech when he speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee." *Thomson v. Scheid*, 977 F.2d 1017, 1021 (6th Cir. 1992).  The Court finds this letter to address internal [Lewis Center] issues that were of concern to Rodgers as Director of Qualify Management, not as a citizen.  As the

---

[2] Because the district court found that Plaintiff failed to meet this threshold issue, it declined to reach the second and third prongs of the inquiry.

letter does not address a matter of public concern, this Court's inquiry is at an end.

(J.A. at 17.) We disagree with the district court's reasoning, because this narrow interpretation of what speech addresses a public concern misinterprets the guidelines enunciated by the Supreme Court in *Connick*.

In *Connick,* 461 U.S. at 140-41, a district attorney proposed to transfer Sheila Myers, an assistant district attorney. Myers strongly opposed the transfer and expressed her opposition to several supervisors. She then prepared and distributed a questionnaire to other assistant district attorneys in the office, soliciting their views on "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.* at 141. Perceiving the questionnaire dissemination as insubordination, the district attorney fired Myers. In holding that Myers' First Amendment rights were not violated, the Supreme Court emphasized that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147. The Court held that, aside from one question about pressure from the district attorney to work on political campaigns, the contents of the questionnaire were "mere extensions of Myers' dispute over her transfer" and thus did not involve matters of public concern. *Id.* at 148. In so holding, the Court reasoned that the questionnaire did not attempt to "evaluat[e] the performance of the District Attorney as an elected official," inform the public that the district attorney's office was failing to discharge its governmental responsibilities, or "bring to light actual or potential wrongdoing or breach of public trust" occurring in that office. *Id.* At no point in *Connick* did the Supreme Court suggest that an employee's speech made in the course of employment

is necessarily precluded from enjoying First Amendment protection. Rather, *Connick* held that a court's inquiry should not focus on who made the statement, but rather on the point of the speech itself.

Nevertheless, the district court relied on one sentence found in our decision in *Thomson v. Scheid,* 977 F.2d 1017 (6th Cir. 1992), to wit, "First Amendment protection extends to a public employee's speech when he speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee." *Id.* at 1020. Such reliance was in error.

First of all, a review of the facts in *Thomson* reveal that the *Thomson* court did not draw the narrow boundaries the district court attributed to it. In *Thomson,* the plaintiff was hired by the county to investigate suspected fraud by the county commissioner. During the course of his investigation, the plaintiff spoke with his supervisors about his desire to file formal charges against the county commissioner, but the supervisors warned the plaintiff not to proceed without following the established department policies and procedures. In the plaintiff's subsequent lawsuit, he pointed to this conversation with his supervisors and alleged that he was retaliated against for the statements he made during that conversation. *Thomson* began by observing that "[n]ot all matters discussed within a government office are of public concern, and thus internal office communication does not necessarily give rise to a constitutional claim." *Id.* at 1020-21. *Thomson* then examined the speech at issue and concluded that the conversation concerned how the plaintiff would proceed with his investigation, and that the plaintiff was not speaking out in that conversation about a topic of public concern, for instance, *whether* or not an investigation should proceed. In so doing, *Thomson* correctly applied the principle that a conversation generally pertaining to an issue of public concern (in *Thomson,* the investigation of allegedly fraudulent activity) does not automatically convert all statements made in that conversation into First-Amendment-

protected speech. Rather, the First Amendment inquiry requires us to examine the point of the speech in question and determine whether the point advances a public or private interest. *Dambrot,* 55 F.3d at 1187.

Thus, the one sentence in *Thomson* on which the district court relied –"First Amendment protection extends to a public employee's speech when he speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee," *id.* at 1021–cannot properly be read in isolation, for it could mislead courts into believing that an employee who speaks out about a matter of public concern, while in the course of his or her employment, is never entitled to First Amendment protection. Such a proposition is incorrect.[3]

Our subsequent First Amendment jurisprudence further confirms that we have never applied such a narrow interpretation of *Connick.* In *Charvat v. Eastern Ohio Regional Wastewater Authority,* 246 F.3d 607 (6th Cir. 2001), an employee brought suit, claiming he was fired for reporting violations of environmental regulations. We held that the employee's speech related to a matter of public concern, even though the employee made the relevant statements in his role as an employee and the speech was not communicated to the public. *Id.* at 617.

---

[3]We previously have clarified that *Thomson* does not stand for the proposition that the district court attributed to it. In *Williams,* 24 F.3d at 1530, the plaintiff spoke out in a meeting of office managers against illegal political patronage employment practices and later advocated the dismissal of a state political appointee who she believed was improperly using government resources to conduct private business. The plaintiff subsequently was demoted, and she brought a § 1983 action against the defendants. *Id.* Relying on *Thomson,* the defendants argued that her speech was not protected because she was speaking as an employee. *Id.* at 1535. We disagreed, reasoning that *Thomson* merely drew a distinction between "[d]iscussions about office policy and job duties," which generally "address matters of only private concern," and other speech which "addresses matters of great public concern." *Id.*

Even more recently we have expressly eschewed applying a "course of employment" gloss on the *Connick* analysis. In *Cockrel v. Shelby County School District,* 270 F.3d 1036 (6th Cir. 2001), a Kentucky elementary school teacher was fired for inviting an actor to discuss the environmental benefits of industrial hemp, a substance that was illegal in the state, with her class. In determining that the speech pertained to a matter of public concern, we rejected holdings from the Fourth and Fifth Circuits that "a teacher, in choosing what he will teach his students, is not speaking as a citizen, but rather as an employee on matters of private interest." *Id.* at 1051 (citing *Boring v. Buncombe County Bd. of Educ.,* 136 F.3d 364, 368-69 (4th Cir. 1998) (*en banc*) and *Kirkland v. Northwide Indep. Sch. Dist.,* 890 F.2d 794, 800 (5th Cir. 1989)). We reasoned that such an approach "essentially gives a teacher no right to freedom of speech when teaching students in a classroom, for the very act of teaching is what the employee is paid to do," and that "[i]f the Fourth and Fifth Circuits' interpretation of *Connick* were correct, then any time a public employee was speaking as an employee . . . the speech at issue would not be protected." *Id.* at 1051-52. We therefore concluded that the content of the teacher's speech touched upon a matter of public concern, even though she was speaking in her role as a school employee at the time. *Id.* at 1052.[4]

Thus, in analyzing whether an employee's speech touches upon a matter of public concern, we consistently have observed the dichotomy *Connick* presented: speaking as a *citizen* (albeit in the employee role) versus speaking as an employee *for personal interest*. As *Connick* emphasized, the

---

[4]Moreover, other circuits have rejected the broader interpretation of *Connick* employed by the district court below. *See, e.g., Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359 (5th Cir. 2000); *Lewis v. Cowen,* 165 F.3d 154 (2d Cir. 1999); *Hulbert v. Wilhelm,* 120 F.3d 648 (7th Cir. 1997); *Azzaro v. County of Allegheny,* 110 F.3d 968 (3d Cir. 1997) (*en banc*); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 925 F.2d 576 (2d Cir. 1991), *aff'd,* 505 U.S. 672 (1992).

focus of the speech is on the point of the speech as opposed to the role of the speaker in saying it. *See* 461 U.S. at 148-49. Having concluded that the district court inappropriately interpreted *Thomson* in adjudicating this case, we now will analyze Plaintiff's August 7, 1998 memo to determine if the speech therein merits First Amendment protection. Specifically, we will consider (1) the point or focus of the speech in question and (2) whether the point "relat[es] to any matter of political, social, or other concern to the community." *Id.* at 146.

Citing *Rahn,* 31 F.3d at 412, as support, Defendant argues that the point of Plaintiff's August 7, 1998 memo was to discuss management incompetency in allocating hospital space and to complain about psychiatrists usurping patient space; therefore, Defendant contends, the indirect references to patient privacy did not constitute a matter of public concern. Defendant's reliance on *Rahn* is misplaced, and her characterization of Plaintiff's August 7, 1998 memo is erroneous. In *Rahn,* the plaintiff-nurse organized a committee and disseminated a press release stating various employment-related grievances about new work rules, and suggesting that the rules could adversely affect patient care. *Id.* at 410-11. However, we found that the point of the plaintiff's press release was to air employment-related grievances, the fleeting reference to patient care in the press release notwithstanding. *Id.* at 412-13.

In contrast to the focus of the press release in *Rahn,* the focus of Plaintiff's August 7, 1998 memo is on patient care. Plaintiff's memo described its purpose as "Survey Preparedness" and "Patient Rights and Ethics." The memo explained that the Lewis Center would be subject to an upcoming JCAH survey, and that the last survey conducted there had found a deficiency at the Lewis Center regarding patient privacy. Plaintiff's memo then commented that patient privacy was hindered by a lack of space and that Plaintiff was "amazed" to see that some of that scarce space had been converted into a psychiatrist office. (J.A. at 139.)

The memo then listed three reasons as to why this conversion was not a good decision. The first two reasons were particularly patient-oriented (the forensic units needed more space for patients who could not leave the unit and such patients needed as much "personal space" as possible), and the last reason was less patient-oriented (such a practice set a precedent for other psychiatrists to use scarce patient space). The memo concluded by emphasizing that "the patient's needs . . . should be the most important factor." (J.A. at 139.) Although Plaintiff's underlying motive in writing the memo might have been to complain about incompetent management, our duty is not to discern her underlying motive, but rather to evaluate her point as it is presented in the speech. *Chappel v. Montgomery County Fire Prot. Dist. No. 1,* 131 F.3d 564, 575-76 (6th Cir. 1997). Plaintiff's point, as we view the memo's contents, was to call Defendant's attention to what Plaintiff perceived as a disregard of patient privacy at the Lewis Center, not to complain about management or other internal disputes.

Furthermore, the focus of Plaintiff's memo pertained to a matter of political, social, or other concern. The parties do not dispute that the JCAH's finding in its previous survey that the Lewis Center had failed to provide adequate patient space and/or privacy constituted a deficiency, or that a finding of a continuing deficiency by JCAH could mean eventual decertification for the hospital. If the Lewis Center was in danger of being decertified, this would be an indication that the hospital (an arm of the state of Ohio) was operating with substandard care for its patients. The quality of patient care in state hospitals presents an issue of public concern. *See Jackson,* 168 F.3d at 910 (holding that an employee's statements about a proposal to merge the state medical college with a public hospital constituted a public concern because "the continued existence of [the medical college] was important to the locality due to the fact that [the medical college] provide[d] health care to area residents" and further reasoning that the "'quality, availability, and cost of health care are among the most important and debated issues of our

time'") (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 937 (3d Cir.1990).[5]

Therefore, drawing all reasonable inferences from the evidence in a light most favorable to Plaintiff, *Williams,* 227 F.3d at 710, we hold that Plaintiff has established the threshold requirement that the contents of her August 7, 1998 memo addressed a matter of public concern.

## B.   Prong Two:  A Balancing of the Parties' Interests

Because Plaintiff has successfully established that her speech touched upon an issue of public interest or concern, we now must balance Plaintiff's interest, as a citizen, in making her speech against Defendant's interest, "as an employer, in promoting the efficiency of the public services" performed at the Lewis Center. *Rankin,* 483 U.S. at 388 (quoting *Pickering,* 391 U.S. at 568).

We previously have observed that in balancing an employee's and an employer's respective interests, we "should consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams,* 24 F.3d at 1536 (citations omitted).  Relevant factors in this regard include "the manner, time, and place of the employee's

expression," as well as "the context in which the dispute arose." *Rankin,* 483 U.S. at 388 (citations omitted). Defendant bears the burden of demonstrating that legitimate grounds existed justifying the termination.  *Id.* (citing *Connick,* 461 U.S. at 150).

Defendant argues that Plaintiff's memo was "disruptive, inflammatory and interfered with working relationships at the Lewis Center," and therefore the Lewis Center's interest in promoting its efficiency overrode Plaintiff's First Amendment interests.  (Defendant's Br. at 20.)  Plaintiff counters that Defendant has identified no evidence that Plaintiff's memo negatively impacted (or might have negatively impeached) the smooth operation of the Lewis Center.

We first note that Plaintiff's memo, on its face, does not appear to be particularly inflammatory.  Although the memo is arguably critical of Defendant's decision to use patient space for doctor's offices, no abusive language is apparent and we do not discern any exceptionally insulting aspect of its presentation.  Defendant notes that Dr. Stewart Harris, the psychiatrist who was referred to in the August 7, 1998 memo by his union affiliation (i.e., as the "1199 psychiatrist"), filed a grievance complaining of the memo's designation of him in this regard.  However, other evidence in the record reflects that the Lewis Center fired Dr. Harris shortly thereafter for alleged sexual harassment, and there appears to be some sort of history of acrimony between Dr. Harris and the hospital which is unrelated to Plaintiff's memo.[6]  Defendant's general

---

[5]Although Defendant insisted in her deposition testimony that the issue of space was irrelevant to the issue of patient privacy, she also indicated that she did not think Plaintiff was lying; rather, she thought that Plaintiff was simply wrong in her opinion. We note that even if Plaintiff's opinion ultimately proved to be incorrect, this does not deprive her statements of First Amendment protection. *See Chappel,* 131 F.3d at 576 ("A public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment.") (citations omitted).

[6]Furthermore, it is unclear how Dr. Harris received a copy of the memo, inasmuch as Plaintiff's listed recipients were Defendant, Alice Gray, Paul Blackwell, and M. Russ.  To the extent that Dr. Harris only received it because one or more of the recipients sent him a copy, Defendant could not have relied upon any disturbance that could not reasonably be traced back to Plaintiff, who limited her audience.  *See Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1054-55 (6th Cir. 2001) (rejecting the school's argument that the teacher's speech had impacted the "efficient operation of the school and a harmonious

assertions that the memo was disruptive are essentially conclusory.

Although it is possible that the August 7, 1998 memo, which was carbon-copied to other employees in the department, might have, to some extent, "undermine[d] a legitimate goal or mission of the employer" in maintaining efficient operation of the hospital or "create[d] disharmony among co-workers," *Williams,* 24 F.3d at 1536, we have never held that the relatively minor associated risk of disharmony as is present in this case would ordinarily overcome an interest in making sure a state hospital maintains its certification (and thus presumably maintains a minimum standard of care for its patients). *See id.* at 1536-37 (rejecting the argument that the state interest of avoiding disharmony between the plaintiff-employee and those she reported outweighed the public interest in reporting politically corrupt practices in the governmental office); *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986) ("[W]hen an employee exposes unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner.") Furthermore, Defendant presents no evidence that Plaintiff's August 7, 1998 memo disrupted the Lewis Center's efficient functioning, and we do not discern, on this record, any meaningful threat to the hospital's efficient functioning. *Rankin,* 483 U.S. at 388-89. Thus, given our precedent on this balancing inquiry, and on this record, Defendant has not demonstrated a state interest that outweighs Plaintiff's First Amendment right to call Defendant's attention to the quality of the Lewis Center's patient care. *Id.*

environment" because her speech had been pre-approved by the school board and, thus, the "disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in that speech").

### C.   Prong Three: A Substantial or Motivating Factor

Finally, an employee must demonstrate that the speech at issue represented a substantial or motivating factor in the adverse employment action. *Johnson,* 215 F.3d at 584. Specifically, the employee must "'point to specific, nonconclusory allegations reasonably linking her speech to employer discipline.'" *Farmer v. Cleveland Pub. Power,* 295 F.3d 593, 602 (quoting *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 144 (6th Cir. 1997)). If the employee meets that burden, the employer may "show[] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy,* 429 U.S. at 287. However, this latter burden "involves a determination of fact" and ordinarily is "reserved for a jury or the court in its fact-finding role." *Perry,* 209 F.3d at 604 n.4 (citing *Tao v. Freeh,* 27 F.3d 635, 639 (D.C. Cir. 1994)).

The parties do not dispute that Plaintiff's August 7, 1998 memo at least played a role in Defendant's decision to terminate Plaintiff. Indeed, Defendant identified that very memo during her deposition as a motivating factor. Therefore, Plaintiff has established a causal link between her First Amendment protected activity and her subsequent termination.

Defendant nevertheless argues that the August 7, 1998 memo could not have been a substantial or motivating factor because (1) the time period between the memo and the termination was almost six months (i.e., August 7, 1998 to January 21, 1999); and (2) several intervening incidents occurred, breaking the link. For support Defendant relies on *Wallscetti v. Fox,* 258 F.3d 662, 669 (7th Cir. 2001), which held that a four month long period of time "between the protected speech and the adverse employment action . . . *without more,* is too long to support a reasonable inference of causation." (citations omitted) (emphasis added). However, *Wallscetti* is distinguishable inasmuch as in that case there was no admission from the employer that the employee's

speech played *any* role in his decision to fire the employee, and therefore the employee could only rely on the four month time gap to support a causal link. Conversely, in the present case Defendant conceded that Plaintiff's memo was a motivating factor in her decision to fire Plaintiff. Therefore, Plaintiff has met her burden of production with respect to showing that her First Amendment protected activity was a motivating factor in Defendant's decision to fire Plaintiff. The burden now shifts to Defendant to demonstrate that she would have fired Plaintiff notwithstanding Plaintiff's exercise of First Amendment protected speech. As noted earlier, this is generally a jury question. *Perry,* 209 F.3d at 604 n.4. Thus, the parties may litigate at trial whether Defendant would have terminated Plaintiff notwithstanding Plaintiff's dissemination of her August 7, 1998 memo. *See Crawford-El v. Britton,* 523 U.S. 574, 593 (1998) (citing *Mt. Healthy,* 429 U.S. at 287).

## IV.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment to Defendant on Plaintiff's First Amendment claim and **REMAND** this case to the district court for further proceedings consistent with this opinion.