**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0718n.06

No. 12-1766

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Aug 06, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MITCHELL J. HOUSEY, Personal Representative of the Estate of Donald J. Housey, | ) ) ) | |
| *Plaintiff-Appellant*, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| MACOMB COUNTY, a municipal corporation; MARK S. SWITALSKI, in his individual and official capacities; KATHRYN GEORGE, in her individual and official capacities, | ) ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN **O P I N I O N** |
| *Defendants-Appellees*. | ) ) ) | |

BEFORE:     MARTIN, SUHRHEINRICH, and COLE, Circuit Judges.

COLE, Circuit Judge.  Donald Housey was removed without a hearing from his position as the Macomb County Probate Court Register following years of written reports to an arm of the Michigan Supreme Court documenting what he considered to be judicial and attorney misconduct within the court.  Housey claims that his removal violated his rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment.  Accordingly, he sued the county and two probate court judges allegedly involved in his removal for wrongful discharge.  The district court ruled in favor of the defendants on all counts, and Housey appealed.  We affirm.

I.

Probate courts make up one of three primary divisions of trial courts in the Michigan state court system—all of which are subject to the "general superintending control" of the Michigan

Supreme Court. Mich. Const. art. VI § 4. Judges serving on the probate courts are elected by the public for six-year terms. Mich. Comp. Laws § 600.811. If a court has multiple probate judges, a "chief judge" is designated on a rotating basis to serve as the "principal administrator" of the court. *See id.* § 600.837(11). The chief judge has full authority to hire (and fire) a "probate register" to fulfill certain administrative duties. *See id.* § 600.833. That brings us to the events which inspired this case.

In December 2002, Chief Judge Pamela O'Sullivan appointed Housey to the position of Macomb County Probate Court ("MCPC" or "the Court") Register. He had been a probate attorney for more than a decade and was fresh off an unsuccessful run for an MCPC judgeship earlier that year. In his new position, Housey became "responsible for the overall administrative functions" of the Court. The official position description also enumerated a laundry list of "essential functions," several of which are relevant here, including ensuring compliance with case-management policies and procedures, supervising the filing of legal documents with the Court, and preparing reports describing trouble spots along with recommendations for corrective actions. Housey discharged these duties without incident for a while.

In September 2004, however, Housey became concerned about what he perceived to be misconduct on the part of one provider of guardianship and conservator services known only as ADDMS, as well as MCPC Judge Kathryn George, who is a defendant in this action. Housey subsequently sent a number of written reports to the State Court Administrative Office ("SCAO"), an arm of the Michigan Supreme Court tasked with overseeing the administration of the state's probate courts. *See id.* §§ 600.152, 600.219. Housey's reports flagged two practices in particular.

The first was George's practice of appointing guardians and conservators, especially ADDMS, from a private list in apparent contravention of an MCPC policy requiring rotational appointments from a single, court-wide list. The second was ADDMS's practice of double-billing estates and mismanaging their wards' affairs, a practice George allegedly facilitated through favorable appointments. SCAO took no direct action in response to these reports.

That is not to say the reports went entirely unnoticed. In June 2005, SCAO commissioned the Whall Group—a private firm specializing in corporate investigations—to conduct a broad "financial and forensic examination" of MCPC "procedures and records." Housey provided information during the course of the audit. The ensuing report told of significant problems within the MCPC, including procedures in conflict with statutory provisions, excessive and inaccurate billing of estates, lack of effective oversight of disbursements and conservator accountings, and mismanagement of real estate transactions. The report also noted a "feeling of 'awkwardness' in the Court" attributable to animosity between competing camps led by O'Sullivan—to which Housey belonged—and George. The report concluded with a number of suggestions for improving court procedures and strengthening oversight of guardians and conservators. Yet chronic problems, both personal and administrative, persisted.

In February 2007, Housey sent the first in a flurry of new written reports to SCAO rehashing many of his earlier complaints regarding George and ADDMS. His final report to SCAO came in December of that same year. All told, Housey sent twenty-one reports over a three-year period. He would later express disappointment that SCAO failed to act on a single one of them. Perhaps because of this inaction, Housey also wrote a letter to the Michigan Supreme Court urging it to

review a number of MCPC files that he claimed would corroborate his allegations. That letter too failed to achieve its desired end.

In January 2008, George assumed the office of chief judge and immediately implemented a number of changes in MCPC policy and procedure. According to Housey, she also used her elevation as occasion to retaliate against him for his written reports. The gist of his allegation is that George gave him more work, less freedom, and otherwise set him up to fail in his register duties. The continued discord between George and Housey seems to have been indicative of larger problems. SCAO commissioned the Whall Group to perform a second audit, which revealed many of the same problems as before. The report ultimately assigned responsibility to "both [O'Sullivan and George] and to a lesser degree the Probate Register." George, for her part, blamed Housey and placed him on administrative leave ostensibly for his role in improprieties identified by the report—namely, his failure to take "corrective action" upon learning that MCPC employees regularly flouted case-assignment policies. The Michigan Supreme Court, on the other hand, blamed George and removed her as chief judge less than a month later. The Supreme Court appointed former Probate Judge Kenneth Sanborn as acting chief judge of the MCPC in her stead. Sanborn immediately reinstated Housey to his position as register.

In November 2009, the Supreme Court appointed Mark Switalski, also a defendant in this action, to succeed Sanborn as chief judge effective January 1, 2010. Switalski inherited a court that was still "struggling to operate effectively and efficiently under the weight of [its own] discord." Around this time, Housey had begun meeting confidentially with an investigator from the Michigan Judicial Tenure Commission ("JTC") regarding irregularities in certain MCPC files, including those

involving ADDMS. These meetings coincided with a subpoena that JTC issued to Housey in his capacity as register for a number of MCPC files. Housey eventually discussed the subpoena and meetings with Switalski during a series of informational interviews prior to Switalski assuming chief-judge duties. Housey also mentioned the letters he sent to SCAO and his concerns regarding George's practices.

In January 2010, shortly after officially assuming the office of chief judge, Switalski terminated Housey. Switalski called it a "coach's decision" but declined to provide more detail at the time. Switalski later testified that he had "come to the conclusion that the Court was not going to make any significant improvement structured as it was," and terminated Housey as a result. Housey has speculated that this explanation is merely pretext, and that the real reason Switalski terminated him was to appease George. In either event, Housey requested a post-termination hearing. Switalski declined the request after consulting with Macomb County's human resources department.

In April 2010, Housey filed this wrongful discharge suit against George, Switalski, and Macomb County in federal district court. He alleged that the defendants fired him on the basis of his written reports and other communications with Michigan officials, and that they did so without first providing him an opportunity to be heard. Accordingly, he made four claims: (1) that the defendants infringed his First Amendment right to speak on matters of public concern under 42 U.S.C. § 1983; (2) that the defendants infringed his Fourteenth Amendment right to due process in the form of a post-termination hearing also under § 1983; (3) that the defendants breached a contract and his legitimate expectations under Michigan law; and (4) that the defendants violated Michigan's

Whistleblower Protection Act. The district court declined to exercise supplemental jurisdiction over the latter two claims, leaving only the constitutional claims relevant on appeal.

After discovery by all sides, the defendants separately moved for summary judgment. The district court granted the summary judgment motions filed by George and Switalski, and dismissed Macomb County as an improper party to the case (thereby rendering its motion for summary judgment moot). The court held that Housey had not engaged in constitutionally protected speech because his written reports to SCAO and communications with JTC "were a requirement of his job" and because his reports and communications "reflect[ed] internal grievances rather than . . . matter[s] of public concern." The court also held that Housey did not have a cognizable property interest in continued employment requiring a post-termination hearing because Michigan law grants the chief judge of a probate court authority to hire and fire the register without assigning cause. Finally, the court held that Macomb County was an improper party to the case because it was not Housey's employer.

Housey filed this appeal. We now consider whether the district court properly dismissed his First Amendment retaliation claim and his Fourteenth Amendment due process claim. We also consider whether the district court properly dismissed Macomb County from the suit.

II.

Housey first contends that the district court erred in granting summary judgment in favor of the defendants on his free-speech retaliation claim. We review this issue de novo, construing the evidence in the light most favorable to Housey and drawing all reasonable inferences in his favor. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).

Under the First (and Fourteenth) Amendment, we must ask three questions in this case: (1) Did Housey engage in constitutionally protected speech when he sent reports to SCAO and communicated with JTC? (2) Was he then subjected to some adverse action by his employer that would discourage a person of ordinary firmness from continuing to send such reports or make such communications? (3) Was the protected speech a motivating factor behind the adverse action(s)? *See Evans-Marshall v. Bd. of Educ. of the Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). Housey "must win each point to prevail." *Evans-Marshall*, 642 F.3d at 337. The district court, however, held that Housey had failed to establish that he engaged in protected speech and thus declined to answer the remaining questions. For this reason, the first question is the only one at issue on appeal, to which we now turn.

It is well-established that the federal government has a greater ability to curtail the free-speech rights of its employees than the public generally—though that ability is not boundless. This additional latitude is in recognition of two competing truths: "government offices could not function if every employment decision became a constitutional matter," *Connick v. Myers*, 461 U.S. 138, 143 (1983), and public employees do not surrender all of "the First Amendment rights they would otherwise enjoy as citizens" upon accepting their employment, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The Supreme Court has devised a three-part framework to define the contours of the free-speech rights of public employees in light of these unique circumstances. Accordingly, a public employee's speech is only protected when: (1) it touches on "a matter of public concern," *Connick*, 461 U.S. at 146; (2) it is not uttered pursuant to the employee's "official duties" but rather

"as a citizen," *Garcetti v. Ceballos*, 547 US. 410, 421, 424 (2006); and (3) the employee's interest in the speech outweighs the government's interest in promoting "the effective and efficient fulfillment of its responsibilities to the public," *id.* at 450. All three are necessary but not sufficient conditions. *Evans-Marshall*, 624 F.3d at 338.

A.

As to the first condition, Housey's communications with SCAO and JTC touched on a matter of public concern. The starting point for our analysis is *Connick v. Myers*, 461 U.S. 138 (1983). In that case, the Supreme Court held that a public employee's speech is only protected by the First Amendment when it addresses "a matter of public concern," which is to say speech that "relat[es] to any matter of political, social, or other concern to the community." *Id.* at 146. An "employee grievance concerning internal office policy," on the other hand, is the sort of speech not entitled to any special protection. *Id.* at 154. The Court further held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48; *see also Rodgers v. Banks*, 344 F.3d 587, 597 (6th Cir. 2003) (holding that an employee's speech is protected "as long as some portion of the speech" addresses a matter of public concern). Of these considerations, content is generally regarded as the most important. *See, e.g.*, *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009).

Contrary to the district court, we find that Housey's speech likely went beyond the mere "employee grievance[s] concerning internal office policy" described in *Connick*. 461 U.S. at 154. His communications to the state agencies exposed what he considered to be serious inefficiencies

and misconduct within a unit of government. Indeed, Housey flagged certain case files in the belief that they revealed a probate court judge who flouted established procedure to the detriment of wards and a conservator group that overbilled estates. There can be little doubt that speech like this is "of general interest and of value and concern to the public." *See San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (per curiam). Not only is the MCPC an institution of public trust, but the affected parties were themselves ordinary members of the public. Moreover, the Michigan Supreme Court clearly considered the MCPC's problems to be a pressing public matter in light of the multiple investigations it commissioned—investigations which largely corroborated Housey's complaints.

The defendants maintain that Housey was motivated in significant part by personal animosity toward George. Yet whether he was or not is beside the point. The "pertinent question is not *why*" he spoke, "but *what* he said." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004) (emphasis in original). And what he said reflected a subject matter that transcended the bounds of a run-of-the-mill employee beef. Housey's speech thus passes the *Connick* matter-of-public-concern test.

B.

But that is not the end of our inquiry. We must also consider whether Housey spoke as an employee performing his job or as a private citizen. Our analysis begins with *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In that case, a deputy district attorney was allegedly fired in retaliation for writing a memorandum to his supervisors expressing concern that a search warrant affidavit contained serious misrepresentations. *Id.* at 414-15. The Supreme Court rejected his free-speech claim because the memorandum was written pursuant to his official duties. *Id.* at 421. The Court simultaneously announced a new rule: "[W]hen public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment purposes" and their statements are not afforded protection as a result. *Id.* Whether a plaintiff is speaking as a public employee or a private citizen is a "practical" determination that turns on whether the employee's speech "owes its existence to [the] employee's professional responsibilities." *Id.*; *see Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544-45 (6th Cir. 2007).

Housey says that his "purely administrative" job duties did not include reporting judicial and attorney misconduct to SCAO or JTC. Though his case may be stronger than the one the Supreme Court rejected in *Garcetti*, it withers under close inspection. For starters, Housey does not dispute that his day-to-day responsibilities included ensuring compliance with established MCPC policies and performing case-management functions, as described in the official position description. Nor does he dispute that his job duties involved reporting trouble spots and recommending corrective actions. Thus, Housey communicated with SCAO and JTC in part because of what he, as a probate court register, "was employed to do." *Garcetti*, 547 U.S. at 421. His written reports regarding appointments and billing practices among probate court participants were bound up in the efficient operation of the MCPC, for which he was responsible. Housey responds that this characterization of his job duties neglects to consider the practical limitations of the register position. *See id.* at 424 (noting that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform"). But even if Housey is right that he reported on the misconduct of a probate judge over whom he had no authority vis-a-vis his duties, it makes little difference here. The employee-or-citizen determination does not turn on whether one exposes the alleged

wrongdoing of a superior or subordinate. Our principal focus is Housey's professional responsibilities, *see id.* at 422, which encompass the communications at issue.

Two additional factors support our conclusion that Housey spoke as an employee rather than a citizen. While it is true that speech does not lose constitutional protection simply because it concerns the subject matter of the plaintiff's employment, *id.* at 421, Housey's reports and communications nevertheless "owe[d] [their] existence" to his responsibilities as a probate court register, *id.* In other words, his speech had a measure of "official significance" because of his duty to ensure that the MCPC was functioning properly. *Id.* at 422 Nor was Housey engaged in the kind of activity for which there is a private analogue. *Id.* at 423. Like the prosecutor in *Garcetti*, Housey expressed his concerns within the confines of intragovernmental oversight channels, *id.* at 423 (describing "communications between . . . government employees and their superiors in the course of official business" as unprotected), which is material, if not dispositive, *see Weisbarth*, 499 F.3d at 545. At the least, Housey's choice of forum suggests that he believed his duty to bring the misconduct to light arose from his position as a probate court register rather than a concerned citizen. It might have been a different case had he written a letter to his local newspaper or tipped off an independent state agency, but he did neither.

We conclude that Housey's speech is not entitled to constitutional protection. His reports to SCAO and communications with JTC arose from his duty to oversee the efficient administration of the MCPC, owed their existence to that duty, and are not the type of activities engaged in by private citizens. His speech thus fails under the *Garcetti* employee-or-citizen test. That alone dooms

his First Amendment retaliation claim regardless of his ability to show that he spoke on a matter of public concern. *See Evans-Marshall*, 624 F.3d at 338.

III.

Housey next contends that the district court erred in granting summary judgment in favor of the defendants on his due process claim. Like the last issue, our review is de novo, and we construe the evidence and draw all reasonable inferences in Housey's favor. *Dye*, 702 F.3d at 294.

The relevant questions under the Fourteenth Amendment are familiar: (1) Did Housey have a cognizable property interest in continued employment? (2) Did the defendants deprive Housey of that interest? (3) Did the defendants afford Housey adequate process before doing so? *See Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Both parties agree that the first question is the only one that matters—Housey was clearly fired without any sort of hearing or other process.

We begin by way of background. In Michigan, probate court registers like Housey serve at the pleasure of the chief probate judges: "In each county . . . the chief probate judge . . . may appoint a probate register, at a reasonable salary fixed by the county board of commissioners. . . . The probate register shall hold office until his appointment is terminated by the . . . chief judge." Mich. Comp. Laws § 600.833. Although this statutory command seems clear enough, there is an additional wrinkle to consider. The Michigan Supreme Court, which retains "superintending control" over the state's probate courts, has since promulgated Administrative Order 1998-5, requiring chief probate judges to "adopt personnel policies consistent with the written employment policies of the local funding unit" as long as adoption is "consistent with the effective operation of the court." The

MCPC and its chief judge complied. Accordingly, Housey's employment was governed by Macomb County's personnel manuals, which were issued in 2001, 2004, and 2009 during his tenure. Our task, then, is to weigh the effect of any promises made in the personnel manuals against the unfettered discretion conferred by statute in determining whether a property interest existed.

A.

We first address the effect of the personnel manuals. A property interest is "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Looking to Michigan law, although at-will employment is the norm, an exception is made where an employer's policies—including written policies in a personnel manual—give rise to a "legitimate expectation of job security in the employee." *Lytle v. Malady*, 458 Mich. 153, 164 (1998); *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 598-99 (1980). Thus, if Housey can "prove []he was a 'just-cause' employee" by virtue of applicable written policies, "under Michigan law []he would possess a constitutionally protected property interest" in his continued employment. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 754, 766 (6th Cir. 2010) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

As the district court noted, both the 2001 and 2004 personnel manuals drafted by the County and adopted by the MCPC contained just-cause provisions. Such provisions clearly count as enforceable implied promises of continued employment, *see Toussaint*, 408 Mich. at 613, sufficient to give rise to a property interest. The defendants are quick to point out that neither manual was in the effect at the time of Housey's termination, that the 2009 manual disclaimed past promises and specifically reverted to an at-will policy, and that earlier manuals expressly reserved the right to

- 13 -

make such a unilateral change. But none of this is enough to undermine Housey's legitimate expectation in his continued employment. Housey notes that Macomb County never actually changed its just-cause policy despite the language in the 2009 manual. Accepting Housey's version of the facts—as we must at this stage—it is apparent that the MCPC and the County continued their practice of affording post-termination hearings (indicative of a just-cause policy) after the 2009 manual went into effect. Under *Toussaint*, an employer's practices can give rise to legitimate expectations just as surely as written policies can. 408 Mich. at 613-15. Thus, if these facts were the only relevant ones, it would seem Housey had a cognizable property interest in continued employment.

B.

Because they are not, we turn to the effect of § 600.833 on Housey's otherwise cognizable property interest. That provision states in relevant part that "[t]he probate register shall hold office until his appointment is terminated by the . . . chief judge." The authority to hire and fire the probate register without cause is not qualified by any other provision. Given the clarity provided by statute, the dispositive question is whether Housey could develop a legitimate expectation of continued employment in spite of it. For Michigan courts, the answer is no. One state appellate court confronting a similar issue held that a "public employee cannot claim an implied contract where it violates the controlling body's statutory authority." *Thorin v. Bloomfield Hills Bd. of Educ.*, 513 N.W.2d 230, 235 (Mich. Ct. App. 1994); *see also Chamski v. Cowan*, 288 Mich. 238, 250 (1939) (holding that an earlier version of the provision now found in § 600.833 provided "authority to dismiss without assigning any cause"). Here, implying a just-cause term in the employment

- 14 -

relationship would seem to infringe the broad discretion conferred by statute on chief probate judges just the same. And Housey cites no persuasive authority to the contrary. Thus, § 600.833 defeats any protectable property interest Housey may have otherwise had in continued employment.

Housey argues that his property interest survives the operation of § 600.833 by virtue of Michigan Supreme Court Administrative Order 1998-5. Specifically, he argues that the chief judge and MCPC "fulfilled AO 1998-5's directive by wholly adopting" the County's personnel manuals, which contained a just-cause policy. Housey's theory is that the chief judge voluntarily agreed to exercise something less than totally unqualified hiring and firing power, giving rise to an enforceable implied promise of continued employment as a result. However, this theory finds little support in Michigan law. Questions of separation of powers notwithstanding, there is also no evidence that the Supreme Court intended to restrict the chief probate judges' statutory authority when it issued Administrative Order 1998-5. Moreover, such a restriction is not "consistent with the effective operation" of the probate courts given the critical importance of the register position. The Michigan legislature understood this, and we have no occasion to upset its judgment by imposing new constraints on the administration of state probate courts. Because enforcing a just-cause policy would "violate" the chief judge's statutory authority with respect to the register position, Housey could not have developed a legitimate expectation of such. *See Thorin*, 513 N.W.2d at 235. Without a cognizable property interest in continued employment, Housey's due process claim falls short.

IV.

Housey finally contends that the district court erred in dismissing Macomb County as an improper party to the case. We review the dismissal for an abuse of discretion. *Sutherland v. Mich.*

*Dep't of Treasury*, 344 F.3d 603, 612 (6th Cir.2003); *see* Fed. R. Civ. Pro. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.").

The crux of the issue is whether Macomb County could be considered Housey's employer. Michigan probate courts receive their funding from the city or county in which they sit. For efficiency reasons, there is sometimes a limited overlap and integration of functions between a probate court and its local funding unit. Macomb County, for instance, handles a number of administrative tasks for the MCPC, including payroll and benefits calculations, as well as a few larger tasks, including approving the MCPC's annual budget. This does not mean that Macomb County is the employer of MCPC personnel. Under Michigan law, the probate court is the sole presumptive employer of its personnel. *See Judicial Attorneys Ass'n v. State*, 459 Mich. 291, 302-03 (1998) (holding that separation of powers requires as much); *Judges of 74th Judicial Dist. v. Bay Cty.*, 385 Mich. 710, 723 (1971) (explaining that "[e]mployees of the district court are employees of the judicial district" and "are not employees of the county, city or other district control unit, even though they are paid by the district control unit"). Moreover, § 600.833 grants the chief judge—as opposed to any other official—exclusive authority to hire and fire the probate court register. All of this makes clear that MCPC was Housey's employer and Macomb County was merely the local funding unit.

Housey disagrees. He cites two cases for the proposition that Michigan probate courts may voluntarily share managerial power—including hiring and firing power—over court personnel with their local funding units. *See Judicial Attorneys*, 459 Mich. at 303 ("The judicial branch may determine on its own authority, for practical reasons, to share with the legislative branch some

limited employment-related decision making upon determining that such sharing is in the best interests of the judicial branch and the public as a whole."); *Turppa v. Montmorency Cty.*, 710 F. Supp. 2d 619, 628 (E.D. Mich. 2010) ("[I]ndividual judges may delegate some of the managerial and administrative duties related to hiring, firing, and compensating judicial workers to local administrators for the sake of convenience and efficiency."). Even so, the problem for Housey is that he has not brought forth any evidence that the MCPC or the chief judge in this case intended to or did delegate hiring and firing power to Macomb County. At best, he can show that Macomb County's personnel manual supplied some of the terms of his employment and that the MCPC shared disciplinary responsibilities with the County's human resources department. Neither is enough to overcome the presumption that MCPC was his sole employer. *See Judicial Attorneys*, 459 Mich. at 302-03. The district court did not abuse its discretion in dismissing Macomb County as a party.

V.

For these reasons, we affirm.