*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0261p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

RAYMOND L. LEE, JR.; JANET M. LEE,
                *Plaintiffs-Appellants,*

     *v.*

COUNTRYWIDE HOME LOANS, INC.; BANK OF
AMERICA, NATIONAL ASSOCIATION,
                *Defendants-Appellees.*

No. 10-3777

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 09-00766—David A. Katz, District Judge.

Argued: November 15, 2011

Decided and Filed:  August 13, 2012

Before:  MERRITT and BOGGS, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** George Roger Smith, Jr., Maumee, Ohio, for Appellants.  Monica Levine Lacks, McGLINCHEY STAFFORD, PLLC, Cleveland, Ohio, for Appellees. **ON BRIEF:** George Roger Smith, Jr., Maumee, Ohio, for Appellants.  Monica Levine Lacks, Richard A. Freshwater, McGLINCHEY STAFFORD, PLLC, Cleveland, Ohio, for Appellees.

_____

## OPINION

_____

    MERRITT, Circuit Judge.  This is a sub-prime mortgage case brought by the borrowers (the Lees) against the lender (Countrywide), its parent company (Bank of America), the mortgage broker (Stonefire), and two of the broker's employees.  The only

_____

[*]After oral argument, Judge Eric L. Clay recused himself because of a potential conflict of interest.

defendants remaining in this appeal are Countrywide and Bank of America.[1]   The primary question on the merits is whether Countrywide defrauded the borrowers either as part of a civil conspiracy or through misrepresentation.  Both of these Ohio common law claims concern the allegedly improper disclosure of the "Yield Spread Premium"–a commission that Countrywide paid Stonefire for bringing the lender the loan.  To recoup this cost, Countrywide raised the interest rate it charged to the Lees over the life of the loan.  Instead of first informing them of their eventual liability for the payment, the Lees claim that Countrywide conspired with Stonefire to hide the Yield Spread Premium and made partial disclosures designed to conceal the complete reality from the borrowers.  The district court granted summary judgment to Countrywide on the civil conspiracy and fraud claims.  We reverse the district court's decision on the civil conspiracy claim because Ohio case law prohibits lenders from knowingly conspiring with brokers to conceal Yield Spread Premiums, or other mortgage costs, from borrowers.  We affirm the district court's resolution of the Lees' fraud claim.

The Lees also bring a federal claim in which they assert that they are entitled to rescind the mortgage on their home under a statutory provision in the Truth-in-Lending Act that grants mortgagors three days to cancel such transactions for any reason.  The district court also granted Countrywide's motion for summary judgment on the Lees' federal claim.  We agree with the judgment of the district court on the Truth-in-Lending Act claim.

## I. Background

The Lees have owned their home in Walbridge, Ohio, since 2005.  In 2006, Kim Deal, a Stonefire loan officer, contacted the Lees and convinced them to meet with Jeff Winke, another Stonefire loan officer, by promising to lower their mortgage payment, get rid of their private mortgage insurance, and consolidate around $20,000 in credit card

---

[1] "Bank of America's presence as a defendant in this case is due to its status as successor by merger to the former Countrywide Bank, N.A.; there is no meaningful difference for present purposes between its own liability and that of defendant Countrywide Home Mortgage. Therefore, the analysis applicable to Countrywide is equally applicable to Bank of America." *Lee v. Countrywide Home Loans, Inc.*, No. 3:09 CV 766, 2010 WL 1487131, at *2 (N.D. Ohio, April 13, 2010).

debt. At the meeting on November 8, 2006, Winke reaffirmed Deal's promises and convinced the Lees to refinance their existing mortgage from Sky Bank. As part of their application for a new loan, the Lees signed several papers that they did not read, which Winke assured them were just "standard documents." One of the documents, entitled "Mortgage Brokerage Business Disclosure", revealed that the "Borrower hereby agrees to pay Business [Stonefire] a mortgage brokerage fee of $7000.00 and a processing fee of $995, paid to Lender . . . ." "[T]he exact amount" of "additional compensation," however, would only "be disclosed at the time of closing . . . ." Stonefire then forwarded this document to Countrywide for it to review with the rest of the Lees' loan application.

The "additional compensation" mentioned in the Mortgage Brokerage Business Disclosure turned out to be the "Yield Spread Premium." This industry term describes all expenses that a lender pays to a broker in order to lower the borrower's up-front closing costs and facilitate loan creation. The borrower then repays the lender through a higher interest rate over the life of the loan. The amount of the Yield Spread Premium in each case is determined by looking at the difference between the preset "par rate" and the interest rate on the eventual loan. The par rate represents the interest rate at which the lender would fund 100% of the loan with no premiums. Lenders calculate and communicate the par rate daily to brokers. For a broker to earn any Yield Spread Premium, the borrower's eventual loan must be "above par." The higher the interest rate on the eventual loan, the higher the premium the broker earns, and the easier it will be for the lender to resell the mortgage to investors in the securities marketplace. *See generally Glover v. Standard Fed. Bank*, 283 F.3d 953, 957-58 (8th Cir. 2002). Here, Countrywide paid a Premium of 3.5%, which increased the interest rate on the loan by 2.75%. The Lees received $162,000 at a variable interest rate that started at 9.25% and had a ceiling of 10.875%–a full 5% higher than the fixed rate on their old loan from Sky Bank.

The Lees, Edward McCabe, and Deal were the only parties at the closing on December 20, 2006. Trident Title, a title company hired by Countrywide, provided the closing services–including preparing all the necessary documents–for the Lees'

mortgage.  As part of these services, Trident Title hired McCabe, a notary signing agent, to attend the Lees' closing, verify their identities, and obtain their signatures on the mortgage documents.  At closing, Janet Lee signed a final HUD-1 settlement statement that described the Yield Spread Premium in sub-prime jargon as a "[p]remium pd to broker by lender to Stonefire Mortgage" of "POC:L5670.00" [$5670 paid outside closing].  She nonetheless alleges that Deal falsely assured her that Stonefire had waived its fee.  She also maintains that McCabe said that such fee waivers are a typical practice.  Both the Lees signed the Notice of Right to Cancel, which acknowledged their "receipt of two copies [each] of NOTICE OF RIGHT TO CANCEL" (emphasis in original).  Raymond Lee claims that his name was absent from this Notice and the rest of the closing package.

The Lees filed this action on February 27, 2009 in the Court of Common Pleas, Wood County, Ohio, against Countrywide, Stonefire, Winke, and Deal.  Countrywide removed the case to federal court on April 2, 2009.  On July 31, 2009, Winke filed for bankruptcy, and the Bankruptcy Act automatically stayed all proceedings against him.  On November 17, 2009, the Lees added Bank of America as a defendant.  Over the next five months all parties filed and responded to motions for summary judgment.  On April 13, 2010, the court granted summary judgment to Countrywide on all claims and to Stonefire on the claim of civil conspiracy.  It simultaneously denied Stonefire's motion for summary judgment on the remaining claims, Deal's motion for summary judgment on all claims, and Plaintiffs' motion for summary judgment against all Defendants.  Following these rulings, the Lees, Stonefire, and Deal entered into a settlement agreement, and, on June 8, 2010, the trial court dismissed the claims against those defendants.  The Lees appeal the grant of summary judgment to Countrywide and the denial of their own motion.

## II. Discussion

### A. Common Law Civil Conspiracy

The Lees claim that Countrywide conspired with Stonefire to advance the broker's breach of its fiduciary duty. "In Ohio, a civil conspiracy consists of the following: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993) (citations omitted). A plaintiff need not demonstrate an explicit agreement but only an understanding or common design between the parties to commit an improper act. *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996) (citations omitted). "The ultimate fact of conspiracy is solely a question for the jury, unless the court can say, as a matter of law, that there is no proof tending to establish a conspiracy." *LeFort v. Century 21-Maitland Realty & Co.*, 512 N.E.2d 640, 645 (1987) (citations omitted).

To survive summary judgment on their civil conspiracy claim, the Lees do not need to show that Countrywide itself owed them a fiduciary duty. *See Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 867 (Ohio 1998). But it is not sufficient, as the Lees suggest, to show only that Countrywide entered into an agreement to pay Stonefire a Yield Spread Premium thereby encouraging Stonefire, a fiduciary, to betray its client. Yield Spread Premiums are not inherently illegal. *See Myer v. Preferred Credit, Inc.*, 766 N.E.2d 612, 630 (Ohio Ct. Comm. Pl. 2001). Rather, the Lees must show that Countrywide was aware that Stonefire was breaching its duty by misrepresenting or concealing the Yield Spread Premium and that Countrywide aided in this breach. We think the Lees have raised a question of fact as to whether Countrywide knew of and aided in Stonefire's breach.

The district court did not agree and found that "there is no evidence that Countrywide or its employees had any knowledge that Stonefire was concealing or misrepresenting the terms of mortgage loans to its clients." *Lee*, 2010 WL 1487131, at *4. But Countrywide received the Mortgage Brokerage Business Disclosure–a "standard form" that Stonefire made the Lees sign during their loan application–which states that

the "exact amount" of "additional compensation" would "be disclosed at the time of closing." Because of this form, Countrywide knew, at the very least, that the final Yield Spread Premium would not be disclosed until closing. Winke, the Stonefire agent who walked the Lees through their loan application, corroborated that advance disclosure of the Premium was not Stonefire's typical practice when he said that he did not inform borrowers of his fees prior to closing. The Lees themselves also swear that they were not told prior to the closing about the Yield Spread Premium. Thus, a juror could infer that Stonefire concealed the Yield Spread Premium prior to closing and that Countrywide knew of this early concealment.

Under Ohio law, Stonefire's failure to disclose the terms of the Yield Spread Premium during the loan application process, prior to closing, violated its obligations to the Lees. Stonefire, as the Lees's mortgage broker, was their fiduciary and had to disclose all material terms of the mortgage. *See Swayne v. Beebles Invs., Inc.*, 891 N.E.2d 1216, 1226 (Ohio Ct. App. 2008). Specifically, Stonefire had to make "advance full disclosure to the borrower/principal that he is paying a higher interest rate to the lender than the broker could obtain from him on the loan, and in exchange for the higher rate the broker is receiving payment from the lender." *Myer*, 766 N.E.2d at 630. Disclosure on the settlement statement provided at closing, even if clear, was inappropriately "after-the-fact." *Id.* at 629 (citations omitted). Requiring "advance full disclosure" of the Yield Spread Premium recognizes that brokers and lenders have designed the closing to be nothing more than a short meeting where inexperienced borrowers are shuttled through the contractual process with assurances that what they are signing consists of mere formalities. The Lees have presented a question of fact as to whether Countrywide knew that Stonefire was violating its fiduciary duties by hiding the "exact amount" of "additional compensation [the Yield Spread Premium]" until "the time of closing."

Even if Stonefire could comply with its obligations of disclosure to the Lees at closing, the Lees have raised a question of fact as to whether anyone ever informed them of the Yield Spread Premium. No document disclosed the terms of the Yield Spread

Premium. Besides the Mortgage Brokerage Business Disclosure, the only document that Countrywide argues informs the Lees of the Yield Spread Premium is the settlement statement, which Trident Title prepared. But the words "[p]remium pd to broker by lender to Stonefire Mortgage" of "POC:L5670.00" would not inform even an experienced borrower that he or she would ultimately be liable for $5670.00 to be paid out of closing to Countrywide as reimbursement for the amount it fronted to Stonefire. *See Lashua v. Lakeside Title & Escrow Agency*, No. 2004CA00237, 2005 WL 844973, at *5 (Ohio Ct. App. April 11, 2005). Indeed, the district court recognized how unhelpful the settlement statement was when it referred to it as a "cryptic allusion." *Lee*, 2010 WL 1487131, at *6 (citations omitted). The Lees have also raised a question of fact as to whether they were orally informed of Yield Spread Premium at closing. They allege that Deal, the Stonefire agent at their closing, never told them about the Yield Spread Premium. He apparently affirmatively informed the Lees that Stonefire had waived its fee, and McCabe, the representative of Trident Title present at the closing, reassured them that such a waiver was a typical practice for brokers. Winke's admission that he routinely does not disclose his fees to borrowers even at closing lends credence to the Lees' allegations. In short, there is sufficient evidence that the Lees were not told, either orally or in writing, of the Yield Spread Premium.

Finally, the Lees have presented a question of fact as to whether Countrywide knew that Stonefire hid the Yield Spread Premium throughout the closing. The first and strongest piece of evidence are the closing instructions, which Countrywide wrote and Trident Title used to prepare the "cryptic allusion" in the settlement statement. They instruct Trident Title to refer to the Yield Spread Premium as a "premium paid to broker by lender"–concealing whom is ultimately liable for the payment. The next sentence insists on "NO EXCEPTIONS" from this "Verbage." A juror could infer that Countrywide conspired to prevent the Lees from understanding that they were paying a higher interest rate on their loan to reimburse the lender for a payment to Stonefire. The Lees also assert that the Mortgage Brokerage Business Disclosure, which explicitly delays disclosure of the Premium until closing, would have put Countrywide on notice that Stonefire habitually neglected its fiduciary duties. *See Myer*, 766 N.E.2d at 629-30.

In addition, a juror could view Countrywide's conscious absence from the entire loan application and closing process–after which it was bound to lend money to the unknown borrowers–as a decision designed to conceal the complete mortgage picture. These pieces of evidence and the reasonable inferences from them raise a question of fact as to whether Countrywide knew of Stonefire's improper concealment of the Yield Spread Premium from the Lees.

The Lees have easily met their summary judgment burden on the question of whether Countrywide aided Stonefire in its breach of fiduciary duty. Ohio law holds that providing access to finance for a fiduciary whom the lender knew was breaching his or her duty constitutes participation in a civil conspiracy. *See Williams*, 700 N.E.2d at 868-69 (finding that the lender's "role in the conspiracy was to allow [fiduciary] to have access to loan money that was necessary to further his fraudulent actions against customers."); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 890 (S.D. Ohio 2002). Here, Countrywide paid the Yield Spread Premium with the understanding that it would be reimbursed by the allegedly unknowing Lees over the life of the loan. Advancing the money for Stonefire's fee qualifies as an act in furtherance of a civil conspiracy.

Ultimately, the Lees have raised the questions of fact necessary to proceed to trial on the claim of civil conspiracy. They have sufficiently alleged a malicious combination between Stonefire and Countrywide to extract a Premium from the Lees without their knowledge. Stonefire's breach of its fiduciary duty to the Lees, if proved at trial, would qualify as an underlying wrong, independent from the conspiracy itself. *See Gosden*, 687 N.E.2d at 496 (citations omitted). Further, Stonefire's breach–the collection of an undisclosed fee from the lender that was ultimately charged to the borrower–would not have been possible without the aid of a co-conspirator, in this case Countrywide, to advance the funds for the Yield Spread Premium. *See LeFort*, 512 N.E.2d at 645 (defining civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual

damages." (citing *Minarik v. Nagy*, 193 N.E.2d 280, 281 (Ohio Ct. App. 1963))).  This case should proceed to trial on the claim of civil conspiracy.

The district court feared that finding for the Lees would create extensive new obligations for lenders. *See Lee*, 2010 WL 1487131, at *5 (observing that "[the statutory] exemption [for lenders from fiduciary duties] would appear to be of little practical benefit if a 'wholesale lender' could avoid civil conspiracy liability only by actively policing the conduct of the third-party mortgage broker."). *See also* OHIO REV. CODE § 1322.081(B).  But there is already an Ohio court opinion directly on point upholding this theory of liability. *See Carver v. Disc. Funding Assocs., Inc.*, No. CVH 20040126, 2004 WL 2827229, at *4 (Ohio Ct. Comm. Pl. 2004) ("Plaintiffs allege that they were charged a higher interest rate than one for which they were qualified in order to fund the yield-spread premium that was not disclosed them. If such is true, it would not only be a breach of a fiduciary duty . . . but could also constitute a civil conspiracy by [broker and lender] to harm the Plaintiffs.").  Nor has the statutory exemption for lenders prevented Ohio courts from finding them liable for civil conspiracy. *See Williams*, 700 N.E.2d at 867-69.  An unfavorable jury verdict in this case would not create new burdens for Countrywide.  All Countrywide has to do when it agrees to a Yield Spread Premium is simply disclose, or demand that the broker disclose, the Premium to the borrowers and how it affects them.

## B. Common Law Fraud

The Lees next allege that Countrywide committed fraud either by misrepresenting the Yield Spread Premium or concealing the agreement to pay it.  Like their previous claim, this claim concerns the proper disclosure of the Yield Spread Premium.  But unlike the Lees' civil conspiracy claim–which focuses on Countrywide's role in Stonefire's fraud–this claim focuses on Countrywide's alleged fraud.  The elements of fraud under Ohio law are: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of

misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm-Cleveland, Inc.*, 514 N.E.2d 709, 712 (Ohio 1987) (citations omitted).

### i. Countrywide's Concealment of the Yield Spread Premium

The Lees argue that Countrywide committed fraud by simply concealing the Yield Spread Premium from them. In effect, they are arguing that Countrywide owed them a duty of disclosure because the lender was acting as their fiduciary. Absent a duty to disclose, mere concealment of a material fact, on its own, does not constitute fraud. *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1988) (citations omitted). Existing Ohio case law describes the traditional relationship between borrower and lender as one conducted at arm's length with no duty of disclosure. *Id.* at 368 (citations omitted). State statutory law creates a similarly detached relationship between traditional lenders, banks, and their debtors. OHIO REV. CODE § 1109.15(E); *see also* OHIO REV. CODE § 1322.081(B) (exempting lenders from most of mortgage brokers' fiduciary duties). The Lees do not suggest that they shared a special relationship with their lender, *see Blon*, 519 N.E.2d at 368, and, thus, we will not impose a fiduciary duty to disclose on Countrywide.

### ii. Partial Misrepresentation of the Premium in the Settlement Statement

The Lees also claim that Countrywide misrepresented the Yield Spread Premium in the settlement statement as a "[p]remium pd to broker by lender to Stonefire Mortgage . . . POC:L5670.00." The district court did not address this allegation presumably because Trident Title, rather than Countrywide, prepared the settlement statement. Instead, it found that the Lees "had no direct communication with representatives of Countrywide." *Lee*, 2010 WL 1487131, at *2. Theoretically, a jury could find that Trident Title prepared the settlement statement as Countrywide's agent, but the Lees fail to allege such a relationship. As a result, we affirm the judgment of the district court on this claim.

C. Rescission under the Truth-in-Lending Act

In their final, federal claim, the Lees assert that they are entitled to rescind the mortgage under the "buyers' remorse" provision of the Truth-in-Lending Act, which gives a borrower three days following the closing of a mortgage to rescind the transaction. 15 U.S.C. § 1635(a). Although the three day limitations period elapsed before the Lees elected to rescind, they argue that, because they did not receive the four required copies of the Notice of Right to Cancel, a three year extension is warranted. *See* 12 C.F.R. § 226.23(b)(1) ("[A] creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind"); 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation . . . ."). In response, Countrywide produced a copy of the Notice of Right to Cancel signed by both Janet and Raymond Lee at closing, which creates a rebuttable presumption that the borrowers received the required disclosures. 15 U.S.C. § 1635(c). To rebut the presumption and survive summary judgment, the Lees have to provide evidence that "would support a jury finding of the nonexistence of the presumed fact." 21 WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5122 (1977). The district court correctly held that the Lees did not overcome the presumption that they received four copies of the Notice of Right to Cancel.[2]

The district court relied primarily on an unpublished case from this court when ruling that "the Lees' own *post hoc* denial of receipt, in affidavit testimony, is [not] sufficient to meet their burden." *See Lee*, 2010 WL 1487131, at *2 (citing *Sibby v. Ownit Mortg. Solutions, Inc.*, 240 F. App'x 713, 717 (6th Cir. 2007)). But it is not necessary to rely on *Sibby* in this case because the Lees do not even deny that they

---

[2]Because we find that the Lees are not entitled to rescind their mortgage with Countrywide, we refuse to address for the first time on appeal whether Countrywide would nonetheless be entitled to summary judgment because the Lees did not tender the loan proceeds at the pleading stage–a requirement that the common law remedy of rescission typically requires but which this court has held is not always appropriate in the statutory context. *See Rudisell v. Fifth Third Bank*, 622 F.2d 243, 254 (6th Cir. 1980) ("The statute clearly does not require the debtor to tender first. . . . Since rescission is an equitable remedy, the court may condition the return of monies to the debtor upon the return of property to the creditor.") (citations omitted).

received the proper number of Notices of Right to Cancel.  Rather, they concede that they do not remember the specific documents that they received at closing and simply swear that everything they received is in the copy package they submitted into evidence. The Lees' copy package, unlike Countrywide's, contained only one copy of the Notice of Right to Cancel without Raymond Lee's name on it.  The Lees argue that their incomplete copy package demonstrates that they did not receive the required disclosures. We hold that the so-called "envelope theory," without more, is insufficient to rebut the presumption of proper delivery which the signed Notice creates.

The Notice of Right to Cancel divulges the Lees' rights and the significance of their signatures clearly and succinctly.  Immediately above the Lees' signatures, the Notice of Right to Cancel reads: "[t]he undersigned each acknowledge receipt of two copies of *NOTICE OF RIGHT TO CANCEL* . . . ." (emphasis in the original).  Their failure to read this clause does not excuse the Lees from its terms.  *See ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 579 (Ohio 1998) ("The legal and common-sensical axiom [is] that one must read what one signs . . . .").  The Lees' rights to cancel the transaction were not unfairly obscured but set forth, using plain language, in the same typeface as the rest of the contract with occasional added emphasis.  Such clarity should be rewarded with a presumption of delivery that cannot be overcome without specific evidence demonstrating that the borrower did not receive the appropriate number of copies of the Notice.

The Lees' affidavits do not rebut the presumption but instead swear only that their copy package is unaltered since closing.  Upon turning to it, the reader discovers that the copy package is missing the three Notices of Right to Cancel.  Any number of explanations could account for the missing Notices. McCabe's affidavit, which the Lees also provide, merely corroborates one of the possible explanations for why their copy package is incomplete.  As the district court noted, McCabe does not claim that he remembers the Lees' closing nor that the Lees received an insufficient number of Notices of Right to Cancel.  He merely theorizes as to how, because of an oversight by Trident Title, the Lees might have obtained a copy package without Raymond Lee's

name on it. The Lees cannot rely on conjecture to rebut the presumption of delivery. While McCabe's theory is plausible, it is not the only explanation for why the Lees' package differed from Countrywide's. *See Jackson v. New Century Mortg. Corp.*, 320 F. Supp. 2d 608, 612 (E.D. Mich. 2004) (finding that the envelope theory leaves "any number of explanations for the missing notices" (quoting *Gaona v. Town & Country Credit*, No. 01-44, 2001 WL 1640100 at *2 (D. Minn. Nov. 20, 2001))). The Truth-in-Lending Act places the burden for showing the nonexistence of the presumed fact, namely their receipt of four copies of the Notice of Right to Cancel, on the Lees. The evidence presented is insufficient to satisfy this burden. The district court correctly granted summary judgment to Countrywide on this claim.[3]

For the reasons discussed above, we affirm the district court's grant of summary judgment on the common law fraud and Truth-in-Lending Act claims but reverse and remand for trial on the common law civil conspiracy claim.

---

[3]In their reply brief on appeal, the Lees also claim that they are entitled to the three-year window for rescission because the delivered Notice of Right to Cancel did not "clearly and conspicuously disclose" Raymond Lee's right to rescind but rather listed only Janet Lee as a "borrower." 15 U.S.C. § 1635(a), (f). Neither Countrywide nor the district court addressed this claim. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). Regardless the Lees are not entitled to relief on this claim because we determine that they received the proper number of copies of the Notice and Raymond actually signed the Notice, suggesting that he understood his right to rescind.