NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0304n.06

No. 21-3748

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 26, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| RUTH A. HUNTER; MARK D. HUNTER, Executor of Estate of David G. Hunter, Deceased, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
|     Plaintiffs-Appellants, | ) ) |  |
| v. | ) ) |  |
| RHINO SHIELD; JAMES H. WILLIAMS; STEVEN C. DOMINIQUE; TRI-STATE COATING INC.; AMCOAT INDUSTRIES, INC.; RUDOLPH J. PALLONE; ALEKSANDRE DGEBUADZE; AMCOAT TECHNOLOGIES INCORPORATED; RHINO SHIELD FLORIDA, | ) ) ) ) ) ) ) ) ) | OPINION |
|     Defendants-Appellees. | ) ) |  |

Before: SUTTON, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** This case arises from a home sale

solicitation contract between David Hunter and a company conducting business in Ohio as "Rhino

Shield" to paint the exterior of the Hunters' home with a "unique coating product," also known as

Rhino Shield. After David passed away, his wife Ruth and son Mark brought this action against

several individuals and companies, alleging that they failed to paint the house properly and refused

to fix the resulting damage they caused. The district court entered judgment for the Hunters on

one of their statutory claims but granted summary judgment to defendants on the remainder and

dismissed the action. The Hunters now appeal parts of that decision. For the following reasons, we affirm the district court's judgment.

## I.

David Hunter faced dire health concerns after his retirement, so he wanted to paint the outside of his Ohio home to ensure that his family could sell it if something ever happened to him. As fate would have it, David saw television advertisements in late 2012 for a company named "Rhino Shield" that offered a unique ceramic coating product that could be used on the exterior of houses. David found these advertisements particularly compelling because they claimed Rhino Shield was "Guaranteed for 25 Years!" and customers would "Never paint [their] home again!" As a result, David picked up the phone and dialed Rhino Shield's 1-800 number.

On November 14, 2012, Rudolph Pallone, a Rhino Shield sales manager, met with David to provide an estimate about how much the company's services would cost. Pallone also gave David a Rhino Shield business card, which again marketed the exterior ceramic coating as backed by a "25 year transferable warranty." On December 31, 2012, David signed a two-page contract agreeing to pay $11,998.00 for Rhino Shield's services and made a down payment of $1,200. R. 18-1, PageID # 407-08.

Several provisions in the signed contract are important to this appeal. To start, the top of the contract contained the words: "Rhino Shield By Tri-State Coating, Inc." *Id.*, PageID # 407. It turns out that Tri-State Coating, Inc. ("Tri-State") is an Indiana company authorized by the Ohio Secretary of State to conduct business in Ohio under the name "Rhino Shield." In addition to being a business name, "Rhino Shield" is a coating material manufactured by Florida-based AmCoat Industries, Inc. ("AmCoat"). AmCoat authorized Tri-State to market, sell, and apply its product and supplied Tri-State with the coating installed on David's home. Steven Dominique is

2

the founder and majority owner of AmCoat, and James Williams is the founder and president of Tri-State.

The contract additionally provided that Tri-State (1) "warrants workmanship for two (2) years after the date of completion and will remedy substantial defects without charge to the Customer, on written notice from Customer within such period," and (2) "warrants the material is of the quality specified and will transfer to the Customer all manufacturer's written warranties." *Id.*, PageID # 408. The contract also contained an arbitration clause requiring that all disputes under the contract are subject to arbitration in Indiana. *Id.* It did not mention that Tri-State would utilize subcontractors for the job or that David had a statutory right to cancel the contract. *See id.*

On May 3, 2013, Tri-State sent subcontractors to David Hunter's home to begin performing the services outlined in the contract. David and his family allege that these subcontractors, including Aleksandre Dgebuadze and John Robertson, did a poor job because they failed to tape and cover all windows and doors before painting, failed to caulk and seal cracks correctly, and did not apply Rhino Shield properly, among other things. Although David paid Tri-State an additional $9,719.00 and signed a "completion certificate" on May 10, 2013, he told Pallone that he would be withholding the remaining ten percent of the contract price because the job was incomplete. In response, Pallone created a "punch list" of potential problems to fix and agreed to send subcontractors back to remedy all appropriate concerns.

On June 7, 2013, the Hunters again met with Pallone and provided a written "deficiency report" containing pictures and descriptions of all the issues they still wanted fixed, and Pallone again agreed to make those repairs. *See* R. 71-7. The Hunters then met with James Williams on June 19, 2013, to express their concerns and dissatisfaction with the job, and Williams himself assured them that Tri-State would correct the issues.

After inspecting the Hunters' home on June 27, 2013, Pallone, apparently satisfied with the job, sent David a letter stating "we have completed the installation of Rhino Shield Ceramic Coating on your home." R. 226-6. He simultaneously sent David a 25-year product warranty, which Tri-State received from AmCoat after informing it about the completed installation. R. 226-7. The 25-year product warranty listed David Hunter as the customer and an effective date of June 25, 2013. *Id.*, PageID # 5045. It further provided:

> The material making up the Rhino Shield Ceramic Coat Permanent Coating System is warranted for twenty-five (25) years against chipping, flaking, or peeling. The manufacturer of Rhino Shield Ceramic Coat Material warrants that at any time up to twenty-five (25) years after the date of application, it will furnish, without cost to the customer, sufficient Coating Material for the replacement of any Rhino Shield Ceramic Coat that has shown inherent defects in the basic Material.
>
> Upon written notice from buyer during warranty period, Tri-State Coatings, Inc. warrants that it will provide replacement product for valid warranty claims for a period of up to twenty-five (25) years after the date of application.
>
> . . .
>
> This Warranty is valid only when the Rhino Shield Ceramic Coat Material is applied by the Manufacturer's approved applicators, and in accordance with the Manufacturer's approved methods.

*Id.* There is no evidence in the record of any written notice from David or any of the Hunters making a specific claim under this product warranty.

The parties eventually reached a stalemate, with the Hunters complaining no one completed the project or repaired the damage to their home, and Tri-State, Williams, and Pallone claiming the opposite. To date, the Hunters paid $10,919.00 under the contract and maintain that they incurred $126,528.01 in damage to their home.

On February 6, 2014, the Hunters filed a lawsuit in Ohio state court (and later, an amended complaint) against several companies and individuals, including "Rhino Shield," Tri-State, AmCoat, Williams, and Pallone, alleging they violated the Ohio Consumer Sales Practices Act

4

("CSPA"), Ohio Rev. Code §§ 1345.01-13, and the Home Solicitation Sales Act ("HSSA"), *id.* §§ 1345.21-28, and were liable for breach of contract and negligent and/or intentional misrepresentation under Ohio law.

The parties litigated the state case for several years, with a target trial date of June 12, 2017. On June 8, 2017, the Ohio trial court granted in part the Hunters' motion for summary judgment, finding that Tri-State and Williams violated the HSSA and CSPA "by failing to provide the complete notice of cancellation required by [Ohio Rev. Code §] 1345.23(B)." As part of pre-trial settlement discussions, the Hunters' counsel sent an email to defendants' counsel on June 9, 2017, stating, in relevant part:

> The Hunters hereby cancel the contract. [They have previously done so, but we reiterate the cancellation again so there is no misunderstanding.]
>
> When there is a failure to provide the right to cancel in accord with Ohio law, then a supplier proceeds at his own risk with the service. Your clients proceeded at their own risk when admittedly failing to provide the statutory right to cancel. The consumer should return the good or service, but when that is not possible, as in this case, then the remedy is to return the parties to their status prior to the service. In this case, that necessarily means that the coating must come off and the property be returned to its condition prior to the transaction. So regardless of whether it should or could be removed, this is the remedy that is available to the consumer in this case. The court has granted summary judgment on this issue in today's ruling. . . .
>
> . . .
>
> The Hunters get to talk about their damages and they do not want the RS coating on their house. We obviously disagree on damages, but . . . this is not the case in which you will get to make the argument when it comes to the CSPA. [I realize you will try, but the jury will receive instructions on damages that permit them to put the Hunters back into the place they were before encountering Rhino Shield. This means that it must come off. This is what the Hunters want.]

R. 215-11, PageID # 4715. Latching onto "[t]he Hunters hereby cancel the contract," defendants filed a notice (and later a motion *in limine*) in the trial court arguing the Hunters cancelled the contract and could no longer seek damages under the CSPA. The Hunters responded that the email

did not constitute a notice of cancellation and they were continuing to seek damages. The assigned magistrate judge agreed with the Hunters and denied defendants' motion *in limine*, reasoning that counsel sent the email during settlement negotiations and did not intend to elect the remedy of cancellation. On September 22, 2017, the Hunters dismissed their state court action against Rhino Shield, Tri-State, Williams, and Pallone without prejudice.[1]

David thereafter died. In late 2018, Ruth Hunter and Mark Hunter, as executor of his father's estate, filed this diversity action in the Southern District of Ohio against Tri-State, AmCoat, Williams, Pallone, "Rhino Shield," "Rhino Shield Florida," AmCoat Technologies Incorporated, Dominique, Dgebuadze, and Robertson. The operative amended complaint alleges that defendants collectively violated the CSPA and the HSSA and were liable for "negligent and/or intentional misrepresentation," breach of contract, breach of express and implied warranties, violating the Magnuson-Moss Warranty Act, and civil conspiracy. The Hunters also requested a declaratory judgment holding defendants collectively liable for those claims, either as agents, joint venturers, or alter egos.

The case proceeded through discovery, and both parties moved for summary judgment. In a thorough and well-reasoned opinion, the district court granted-in-part the Hunters' motion for summary judgment as to their claim that Tri-State violated the HSSA, but denied-in-part the remainder of the Hunters' motion and granted summary judgment to defendants on all other claims. The Hunters' timely appeal followed.

---

[1] The Ohio trial court later dismissed AmCoat from the case for lack of personal jurisdiction. *See Hunter v. Rhino Shield*, 115 N.E.3d 22, 24 (Ohio Ct. App. 2018).

**II.**

We review a district court's grant of summary judgment de novo. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." *Id.* (citation and internal quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (quoting *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993)).

In determining whether the parties met their burden on summary judgment, we must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). We do not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249. We must also keep in mind the ultimate inquiry of whether there is sufficient evidence on which a trier of fact could reasonably find for the non-

moving party. *Rodgers*, 344 F.3d at 595. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment. *Id.*

### III.

The Hunters disagree with the district court's grant of summary judgment to defendants for several reasons, but their overarching argument on appeal is that the district court erred in finding as a matter of law that their counsel's June 9, 2017 email constituted an election to cancel the Rhino Shield contract under the HSSA and barred them from seeking damages under the CSPA. To help understand the significance of this finding, we begin our de novo review with an overview of these two remedial Ohio statutes.

The HSSA is designed to protect "against oppressive, high-pressure sales tactics that are sometimes employed in home solicitations." *Garber v. STS Concrete Co.*, 991 N.E.2d 1225, 1233 (Ohio Ct. App. 2013).[2] One of the ways the HSSA seeks to accomplish this goal is by requiring every home solicitation sale contract to include a written statement informing the buyer that he has a three-day "cooling-off period" to cancel the contract for any reason. *Id.* at 1230-31; Ohio Rev. Code § 1345.22(A). If the seller violates the HSSA by not informing the buyer about this three-day right to cancel, then the buyer may cancel the contract at any time even if the seller has already completed performance. *Clemens v. Duwel*, 654 N.E.2d 171, 177 (Ohio Ct. App. 1995) (citing *R. Bauer & Sons Roofing & Siding, Inc. v. Kinderman*, 613 N.E.2d 1083, 1088 (Ohio Ct. App. 1992)). Relatedly, any violation of the HSSA is necessarily a violation of the CSPA, which generally

---

[2] Where, as here, the Ohio Supreme Court has not directly addressed the state law issue presented in the case, we rely on available precedent from the Ohio Court of Appeals "absent a *strong showing* that the [Ohio Supreme Court] would decide the issue differently." *See Levandofsky v. Durrani*, No. 20-4104, 2021 WL 5710122, at *4 (6th Cir. Dec. 2, 2021) (quoting *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018)).

prohibits an "unfair or deceptive act or practice in connection with a consumer transaction." Ohio Rev. Code §§ 1345.02, 1345.28.

Liability is no longer an issue because the district court held—and neither party disputes—that Tri-State (1) violated the HSSA (and CSPA) by not complying with the three-day cancellation notice requirement, and (2) violated the CSPA by including an improper arbitration provision in the contract and not informing the Hunters that subcontractors would apply Rhino Shield to their home.[3] However, the parties vehemently disagree about what remedies are still available to the Hunters for these violations.

Although the HSSA and CSPA both prohibit certain deceptive sales tactics, these statutes provide for distinct and mutually exclusive remedies. The HSSA allows consumers to cancel a home solicitation sale contract and receive a refund of all payments previously made thereunder. Ohio Rev. Code § 1345.23(D)(4)(a). And under the CSPA, an aggrieved consumer may seek to recover up to three times the amount of actual economic damages or rescind the contract if there has not "been a substantial change in the subject of the consumer transaction." *Garber*, 991 N.E.2d at 1232; Ohio Rev. Code §§ 1345.09(A), (B). While a consumer may initially plead alternative theories of recovery by alleging that defendants violated the CSPA and the HSSA, eventually the "consumer must elect which remedy to base recovery on because the consumer cannot recover under both" statutes. *Garber*, 991 N.E.2d at 1233.

It is undisputed that the Hunters' statutory right to cancel the contract never expired because Tri-State did not provide them with the requisite notice of cancellation under the HSSA. *See* Ohio Rev. Code § 1345.23(C). It is also undisputed that the Hunters' counsel sent defendants'

---

[3] The district court granted AmCoat and Dominique's motion for summary judgment on the Hunters' CSPA and HSSA claims because there was no evidence that those defendants engaged in a "consumer transaction" with the Hunters, as required by Ohio Revised Code § 1345.01. The Hunters do not appeal that decision.

counsel an email stating: "The Hunters hereby cancel the contract. [They have previously done so, but we reiterate the cancellation again so there is no misunderstanding.]" R. 215-11, PageID # 4715. The HSSA makes clear that a buyer may cancel a home solicitation sale contract by "giving written notice of cancellation to the seller at the seller's . . . electronic mail address," and that cancellation becomes "effective when the electronic mail has been sent." Ohio Rev. Code § 1345.22(A). "Notice of cancellation need not take a particular form and is sufficient if it indicates, by any form of written expression, the intention of the buyer not to be bound by the home solicitation sale." *Id.* Notably, we are not aware of any legal authority (nor do the Hunters cite any) holding that a buyer's written notice of cancellation is nullified if sent during settlement negotiations.[4]

For the Hunters, this case is as much about exterior coating as it is about framing—framing the issue, that is. They contend that summary judgment is improper because there is a genuine dispute of fact regarding whether they intended to elect the remedy of cancellation under the HSSA rather than damages under the CSPA. We do not agree with how the Hunters frame the issue, however, as it is irrelevant for our purposes whether they intended the legal consequences that flowed from their unambiguous decision to cancel the contract. Even if the Hunters' counsel may have mistakenly believed that a buyer could both cancel the contract under the HSSA and also recover damages under the CSPA, that does not change the undisputed fact that he sent an email properly cancelling the contract on behalf of his clients. Indeed, as the district court noted, the "objective manifestation of intent" to cancel the contract "could not be any clearer" than what counsel wrote in his email.

---

[4] The Hunters originally argued to the district court that the cancellation email was inadmissible hearsay under Federal Rules of Evidence 408 and 802. It appears the Hunters have since abandoned this argument on appeal, suggesting there is no longer a dispute about the authenticity or admissibility of the email for purposes of summary judgment.

The Hunters do not dispute that their counsel was acting within the scope of his actual or apparent authority when he sent the June 9, 2017 email on their behalf. *See Saunders v. Allstate Ins. Co.*, 151 N.E.2d 1, 4 (Ohio 1958). That email explicitly cancelled the contract, bound the Hunters and became effective when sent, and constituted a de facto election to pursue a remedy under the HSSA—and only the HSSA—regardless of whether they would have preferred receiving damages. *See Garber*, 991 N.E.2d at 1235. Therefore, the Hunters' remedy is limited to a refund of the $10,919.00 they paid to Tri-State under the contract, and they are precluded from seeking a double recovery of damages under the CSPA. *Smith v. Sack*, 60 N.E.3d 667, 673 (Ohio Ct. App. 2016). Given that the Hunters may no longer enforce the now-cancelled contract in any other context, *see Clemens*, 654 N.E.2d at 178, we will affirm the district court's decision to dismiss the Hunters' dependent claims for CSPA violations, breach of contract, and breach of the contractual two-year workmanship warranty as a matter of law.

The Hunters' remaining arguments on appeal similarly fail to convince. First, they contend the district court erred by dismissing their breach of express warranties claim under Ohio law without considering the non-contractual oral warranties defendants conveyed to David Hunter. These non-contractual warranties allegedly included, among other things, that the Rhino Shield coating would not chip, flake, blister, peel, or require maintenance, and that David Hunter would "Never Paint Again!"[5] The problem with this argument is that—as the Hunters argued below—the Ohio Uniform Commercial Code ("OUCC") governed the parties' agreement to paint David's home with Rhino Shield. *See Evilsizor v. Becraft & Sons Gen. Contractors, Ltd.*, 806 N.E.2d 614, 617 (Ohio Ct. App. 2004). Under the OUCC's parol evidence rule, "[t]erms . . . set forth in a

---

[5] To the extent the language "Never Paint Again!" comes from Rhino Shield's website, David Hunter could not have possibly relied on that language because he testified "I don't do computers" and never viewed the website. R. 159, PageID 2399-400.

11

writing intended by the parties as a final expression of their agreement with respect to such terms . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Ohio Rev. Code § 1302.05; *see also Williams v. Spitzer Autoworld Canton, LLC*, 913 N.E.2d 410, 415-16 (Ohio 2009). Evidence that the Hunters relied on express warranties not included in the contract would contradict the parties' written agreement, which "constitute[d] the entire agreement between the parties" and explicitly provided (in all capital letters) that "TRI-STATE COATING EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES EXCEPT AS PROVIDED HEREIN." Accordingly, the OUCC's parol evidence rule bars the Hunters from introducing evidence of any non-contractual express warranties.

The Hunters urge us to reach a different conclusion and ignore the parol evidence rule because Tri-State's contractual disclaimers are allegedly inconsistent with Rhino Shield's advertisements and Pallone's express representations, and the Ohio Court of Appeals has held disclaimers of liability invalid if they are inconsistent with the seller's previous oral express warranties. *See Barksdale v. Van's Auto Sales, Inc.*, 577 N.E.2d 426, 429 (Ohio Ct. App. 1989). This argument, too, faces an insurmountable hurdle because the contract in this case included a disclaimer of reliance. Unlike in *Barksdale*, the contract here provided:

> Tri-State Coating is not liable or bound by any warranties, guarantees, statement, or representations made by any broker, agent, employee, or other person representing or proposing to represent to Tri-State Coating unless expressly set forth in the Agreement.

R. 1-1, PageID # 70-71. This "full disclaimer of reliance," as opposed to an unreasonable disclaimer of liability, gave the Hunters "fair warning as to the reliability of any representation external to the terms." *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp. 2d 954, 963 (N.D. Ohio 1998); *see also Agristor Leasing v. A.O. Smith Harvestore Prods.*, 803 F.2d 1401, 1410 (6th Cir. 1986) (Boggs, J., concurring) (explaining distinction between a

disclaimer of liability and a disclaimer of reliance). So even if the parol evidence rule did not prevent the Hunters from admitting evidence of extrinsic warranties, this disclaimer negates any argument that David Hunter reasonably relied on any non-contractual oral warranties. We therefore agree that the Hunters are unable to meet their burden to survive summary judgment on their breach of express oral warranties claim.

Second, the Hunters argue that the district court wrongly dismissed their claim that defendants violated the Magnuson-Moss Warranty Act ("Magnuson-Moss Act") because there was at least a dispute of fact regarding whether they gave defendants a reasonable opportunity to cure defects under the 25-year product warranty. The Magnuson-Moss Act authorizes a federal private right of action for breach of an express or implied warranty under state law. *See Kuns v. Ford Motor Co.*, 926 F. Supp. 2d 976, 983-84 (N.D. Ohio 2013) (citing 15 U.S.C. § 2310(d)(1)). To succeed on a Magnuson-Moss Act claim, the plaintiff must prove a breach of warranty and demonstrate that the seller had a "reasonable opportunity to cure any defects" under the warranty but failed to do so. *Id.* at 984.

We agree with the district court that the Hunters' Magnuson-Moss Act claims against Tri-State and AmCoat fail, albeit for different reasons. As to Tri-State, "the applicability of the Magnuson-Moss Act is directly [dependent] upon a sustainable claim for breach of warranty," meaning "if there exists no actionable warranty claim, there can be no violation of the" Act. *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005) (citing *Labonte v. Ford Motor Co.*, No. 74855, 1999 WL 809808, at *7 (Ohio Ct. App. Oct. 7, 1999)). Tri-State agreed to warrant and replace any Rhino Shield product on the Hunters' home that was "chipping, flaking, or peeling" for up to 25 years, but it was obligated to do so only "after the date of application" and "[u]pon written notice from [the] buyer during [the] warranty period." *See* R. 226-7, PageID 5045.

13

Although the Hunters sent Tri-State a written deficiency report on June 7, 2013, detailing the alleged damage to their property, they sent that report *before* Tri-State completed the application of Rhino Shield and the product warranty became effective.

Moreover, the Hunters' written report focused exclusively on Tri-State's workmanship issues, which, by its own terms, the product warranty would not have covered. Indeed, the closest the Hunters come to making a deficient-product claim is by reporting cracks in the paint, but that was because Tri-State agreed to "*seal large cracks* and gaps" as necessary, and not because the Rhino Shield product itself was deficient. *See* R. 18-1, PageID # 404. Without receiving any written notice under the product warranty after June 25, 2013, Tri-State had no obligation to perform under the 25-year product warranty and cannot be liable for a breach. Similarly, the Hunters have not produced any evidence demonstrating they ever informed AmCoat of any defects in the Rhino Shield coating material, and therefore the district court properly dismissed their Magnuson-Moss Act claim against AmCoat for failing to satisfy the "reasonable opportunity to cure" element.

Third, the Hunters contend that the district court wrongly dismissed their "negligent and/or intentional misrepresentation" claim for being based on the same actions as their breach of contract claim. The essence of this tort claim, which the Hunters now describe as "fraudulent inducement," is that Tri-State fraudulently misrepresented facts about the quality and durability of Rhino Shield to induce David to sign the service contract. But even assuming the Hunters could prove fraudulent inducement, they would not be entitled to any relief. That is because "[a] party who is fraudulently induced to enter a contract may sue to rescind the contract" or "retain the contract and sue for damages for the tort of fraudulent inducement." *Butler Cty. Bd. of Commrs. v. Hamilton*, 763 N.E.2d 618, 632 (Ohio Ct. App. 2001) (citation omitted). Having already cancelled the contract

in question, the Hunters can neither rescind it now nor cancel it again. Accordingly, we agree with the district court's grant of summary judgment to defendants on the Hunters' misrepresentation claim.

Fourth, the Hunters argue that the district court erred by granting summary judgment to defendants on their claims for civil conspiracy, a declaratory judgment that defendants are vicariously liable as a joint venture and under agency principles, and alter ego liability. These three related claims are aimed at holding defendants liable for each other's allegedly unlawful acts. For example, civil conspiracy under Ohio law allows victims of an unlawful act to extend the potential pool of defendants to persons who *conspired to commit* the wrong, rather than just those who accomplished it. *See Gosden v. Louis*, 687 N.E.2d 481, 497-98 (Ohio Ct. App. 1996) (citations omitted). Similarly, members of a "joint venture" may be jointly and severally liable for the actions of each coventurer, *see Al Johnson Const. Co. v. Kosydar*, 325 N.E.2d 549, 553 (Ohio 1975), and principals may be vicariously liable for the actions of their agents, *see Nat'l Union Fire Ins. Co. v. Wuerth*, 913 N.E.2d 939, 943 (Ohio 2009) (citations omitted). And "alter ego" liability and "veil piercing," while distinct concepts, both seek to look beyond the corporate form and hold the company's owners liable for the company's unlawful actions. *See Church Joint Venture, LP v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020); *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1086 (Ohio 1993). But herein lies the critical problem for the Hunters: liability under all these theories still requires proof of a valid cause of action.

Let us start with civil conspiracy, which requires proof of "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 446 (6th Cir. 2012) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629

15

N.E.2d 28, 33 (Ohio Ct. App. 1993)).  At this time, the Hunters' only remaining cause of action is their already-proven claim that Tri-State violated the HSSA.  However, instead of alleging that defendants conspired to commit this statutory violation, the Hunters rely on their claims of fraudulent inducement, breach of contract, and breach of warranties to support their civil conspiracy claim.  R. 18, PageID # 396-99.  Because "[a]n underlying unlawful act is required before a civil conspiracy claim can succeed," *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998), and because the district court properly dismissed every non-HSSA claim in this case, we agree the Hunters' civil conspiracy claim must be dismissed as a matter of law.

For similar reasons, we agree the Hunters are not entitled to a declaratory judgment holding defendants vicariously liable for Tri-State's HSSA violation—which again, is the only claim resulting in liability in this case.  The Hunters' agency theory is unsubstantiated because they do not allege or argue that any defendant was acting as a principal of Tri-State when it omitted the statutory right to cancel from the contract.  Nor is there sufficient evidence to hold defendants vicariously liable for Tri-State's actions as a joint venture.  "A joint business adventure necessitates a joint contract, express or implied, between the joint adventurers to engage in a specific business enterprise . . . ."  *Meinert Plumbing v. Warner Indus., Inc.*, 90 N.E.3d 966, 977 (Ohio Ct. App. 2017) (citations omitted).  To support their theory that defendants are part of a joint venture, the Hunters spill much ink making conclusory allegations that AmCoat owner Dominique, Tri-State owner Williams, Tri-State sales representative Pallone, and subcontractors Dgebuadze and Robertson joined to create a business enterprise called "Rhino Shield" to avoid liability for falsifying information to sell Rhino Shield coating to customers.  But what the Hunters are missing, as the district court noted, is any evidence showing that defendants intended and agreed to be "coadventurers, with an equal right of control" over a "Rhino Shield" enterprise.  R. 240, PageID

16

# 5367 (citing *Meinert Plumbing*, 90 N.E.3d at 977). The Hunters had more than eight years of litigation to produce this evidence, and their failure to do necessitates dismissal of their joint-venture theory of liability.

We also find the Hunters' alter ego theory unduly speculative and unsupported. As relevant to this appeal, the Hunters allege that the individual defendants so dominantly controlled AmCoat and Tri-State that they should be viewed as the same entities. Given that AmCoat is not liable for any cause of action in this case, we need only decide whether any individual defendant can be considered an "alter ego" of Tri-State. The Ohio Supreme Court instructs that the alter ego doctrine of liability applies, and individuals may be held liable for wrongs committed by a corporation, when "control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own[.]" *Belvedere*, 617 N.E.2d at 1086; *see also Byars v. Herman*, No. 83496, 2004 WL 1532224, *3 (Ohio Ct. App. July 4, 2004) (noting this prong from *Belvedere* "is basically the 'alter ego doctrine'"). To determine whether an individual is a company's alter ego, courts may consider "(1) whether corporate formalities were observed; (2) whether corporate records were kept; (3) whether corporate funds were commingled with personal funds; and (4) whether corporate property was used for a personal purpose." *U.S. Bank Nat'l Assoc. v. MMCO, LLC*, 183 N.E.3d 499, 515 (Ohio Ct. App. 2021) (quoting *Byars*, 2004 WL 1532224, at *3). Our analysis ends there because there is absolutely no evidence in the record supporting the claim that AmCoat's owner, Tri-State's sales representative, Tri-State's subcontractors, or Tri-State's majority owner are indistinguishable from and share the same "mind" as Tri-State, such that they should be held personally liable for the HSSA violation.

Thus, we agree with the district court's refusal to pierce the corporate veil and impose liability on any individual defendants as alter egos of Tri-State.[6]

Fifth, and last, the Hunters contend the district court should not have dismissed Williams from this case based on res judicata and Ohio's so-called two-dismissal rule. Central to this decision was the district court's conclusion that the Hunters did not serve Williams with the original February 2014 state court complaint within one year. So when the Hunters later amended the complaint and instructed the clerk to serve Williams, they, "by operation of law," were voluntarily dismissing their original claims against Williams without prejudice. *See Sisk & Assoc., Inc. v. Commt. to Elect Timothy Grendell*, 917 N.E.2d 271, 273 (Ohio 2009). Under Ohio's two-dismissal rule a plaintiff may dismiss claims against a defendant without prejudice once, but if he refiles claims arising out of the same transaction and dismisses them again, the second dismissal will be *with* prejudice. *See Wellfount, Corp. v. Hennis Care Ctr. of Bolivar, Inc.*, 951 F.3d 769, 772 (6th Cir. 2020); Ohio R. Civ. P. 41(A). Thus, according to the district court, the Hunters' "second" dismissal of claims against Williams on September 22, 2017, resulted in a judgment on the merits and triggered the doctrine of res judicata. We pause here because there appears to be a dispute of fact regarding whether Williams personally accepted service of the February 2014 complaint, or whether, as his attorney testified, he was merely accepting service on behalf of Tri-State. But we see no need to analyze that issue further because even if the district court erred by ignoring this potential factual dispute, any error would be harmless because the Hunters do not have any remaining claims against Williams in this case.

---

[6] As we mentioned above, the alter ego doctrine and veil piercing are different concepts. In Ohio, proving a defendant is the alter ego of a company is one of three requirements for piercing the corporate veil. *See My Father's House #1, Inc. v. McCardle*, 986 N.E.2d 1081, 1089 (Ohio Ct. App. 2013). But because the Hunters have not shown defendants are alter egos of Tri-State, we have no reason to address the other two requirements.

18

Accordingly, we **AFFIRM** the district court's grant of summary judgment to the Hunters on their HSSA violation claim and to defendants in all other respects.